UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| JOHN R. GRAYBILL, and PATRICIA GOFF-GRAYBILL | No. C 12-05802 LB |
| Plaintiffs, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | [ECF No. 23] |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |
| _____/ | |

## INTRODUCTION

Plaintiffs John R. Graybill and Patricia Goff-Graybill (the "Graybills") filed this lawsuit against Wells Fargo Bank raising eight claims stemming from Wells Fargo's actions regarding their mortgage loan, their 2006 refinancing of it, their 2009 attempts to modify the loan under the Home Affordable Modification Program ("HAMP"), and the foreclosure of their house: (1) breach of a third-party contract; (2) breach of contract; (3) promissory estoppel; (4) violation of California's unfair competition law, Cal. Bus. & Prof. Code § 17200; (5) fraud; (6) negligence; (7) declaratory and injunctive relief; and (9) fraud and misrepresentation. Second Amended Complaint ("SAC"), ECF No. 21.[1] Wells Fargo moved to dismiss the SAC. The court finds the matter suitable for determination without oral argument under Civil Local Rule 7-1(b) and GRANTS the motion with

---

[1] Citations to the Electronic Case File ("ECF") have pin cites to the electronically-generated page number at the top of the document.

1    prejudice as to claim one and with leave to amend as to claims two through eight.

2                                                **STATEMENT**

3    **I.  FACTUAL BACKGROUND**

4         From November 1987 to July 23, 2012, the Graybills, who are married, lived at their home at

5    608 Eastwood Way, Mill Valley, California.  Second Amended Complaint ("SAC"), ECF No. 21, ¶

6    5.  This case involves their loan refinancing in 2006 with World Bank and their attempts to secure a

7    HAMP loan modification in 2011 with World Bank's successor, Wachovia/Wells Fargo.  *See id.*

8    Through "all times pertinent" to the SAC, Wells Fargo has claimed that it had the right to service

9    and collect on the loan.  *Id.* ¶ 25.

10        This section first reviews the history of World Bank/Wachovia/Wells Fargo and then

11   summarizes the complaint's allegations about the refinancings and the attempted loan modification

12   under HAMP.

13        **A.  The Defendant Wells Fargo Bank**[2]

14        World Bank changed its name to Wachovia Mortgage on December 21, 2007.  *Id.* ¶ 15.  Wells

15   Fargo agreed to buy Wachovia in October 2008 and then completed the purchase in January 2009.

16   _____

17        [2]  Defendants ask the court to take judicial notice of the following: (1) the deed of trust for
     the Graybills' property; (2) the Certificate of Corporate Existence of World Savings Bank, FSB
18   issued by the Office of Thrift Supervision ("OTS"); (3) a letter from the OTS reflecting the name
     change from World Savings Bank, FSB, to Wachovia Mortgage, FSB; (4) Wachovia Mortgage,
19   FSB's charter, signed by the OTS; (5) the Official Certification of the Comptroller of the Currency
     ("OCC") reflecting Wachovia Mortgage, FSB's conversion to Wells Fargo Bank Southwest, N.A.
20   and merged into Wells Fargo Bank, N.A.; (6) a print-out from the FDIC's website regarding the
     history of Wachovia Mortgage; (7) the notice of default and intent to sell the Graybills' homes; (8)
21   the notice of trustee's sale dated June 27, 2011 and recorded June 29, 2011; (9) the trustee's deed of
     sale dated November 2, 2011 and recorded November 4, 2011; and (10) the state court docket sheet.
22   *See* Def.'s Request for Judicial Notice ("RJN"), ECF No. 24; *id.* Exs. A-J.  Plaintiffs did not oppose
     any of these requests.  The court may take judicial notice of matters of public record like these, and
23   undisputed facts in them, and records reflecting official acts of the Executive Branch, without
     converting a motion to dismiss into a motion for summary judgment.  *Lee v. City of Los Angeles*,
24   250 F.3d 668, 689 (9th Cir. 2001); *Hotel Employees & Rest. Employees Local 2 v. Vista Inn Mgmt.
     Co.*, 393 F. Supp. 2d 972, 978 (N.D. Cal. 2005); Fed. R. Evid. 201(b).  It does so here.
25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

*Id.* ¶ 17.  On November 1, 2009, Wachovia converted to a national bank called Wells Fargo Bank Southwest, NA, which then merged with and into Wells Fargo Bank, NA.  *Id.*  With the merger, ultimately the servicing of Plaintiffs' loans was taken over by Wells Fargo Home Mortgage, a division of Wells Fargo Bank.  *Id.* ¶ 18.  Plaintiffs' dealings with Wells Fargo during the years 2010 and 2011 were often with Wachovia and representatives of Wells Fargo Bank that were identified as representatives of Wachovia, and Wachovia's name appears on some of the documents discussed in the complaint and attached to it.  *Id.* ¶ 21.  Wells Fargo has also done business as America's Service Company ("ASC").  *Id.* ¶ 23.

On April 13, 2009, Wells Fargo, doing business as ASC, contracted with the Federal Mortgage National Association ("Fannie Mae"), in its capacity as financial agent of the United States, to provide foreclosure prevention services intended to provide homeowners with affordable loan modifications.  *Id.* ¶¶ 26, 40-41; *see id.* Ex. 1 (copy of the contract or "Servicer Participation Agreement" ("SPA")).  The SPA was titled the Commitment to Purchase Financial Instrument and Servicer Participation Contract for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008.  *Id.* ¶ 40.  Under the terms of the SPA, Wells Fargo was eligible to receive $2,873,000,000 in taxpayer funds.  *Id.* ¶¶ 26, 85 ("Wells Fargo received consideration for its participation in the HAMP program").  In return, Wells Fargo agreed to perform certain loan modification and foreclosure prevention services "to benefit homeowners by providing them with affordable loan modifications."  *Id.* ¶¶ 26, 40.  These services, and the contract provisions that Wells Fargo allegedly violated, are discussed below.

**B. The 2006 Refinancing**

In 2005, the Graybills refinanced their home mortgage by taking out a loan from World Savings Bank, FSB ("World Savings").  *Id.* ¶ 12.  They also had a second mortgage from World Savings.  *See id.* ¶ 13.  In August 2006, the Graybills owed $516,000 on their first mortgage and $74,200 on the second for a total of $590,200.  *Id.* ¶¶ 12-13.

Around June or July 2006, World Savings solicited the Graybills to refinance their mortgage, and they began working with loan officer Patricia Rufenacht.  *Id.* ¶ 206.  One or both plaintiffs met with her in July and August 2006 for a total of about six time to complete an application, and she

talked with them by phone a few times in August to persuade them to take out a loan to replace their existing loan. *Id. ¶* 207. During conversations in August 2008 in her office, Rufenacht falsely told Plaintiffs that it would be in their best interests to consolidate their two mortgages into one mortgage with a principal of $635,000. *Id.* ¶ 208. She "falsely informed and assured" them that the best interest plan for their new mortgage was be the "PICK-A-PAYMENT" plan. *Id.* ¶ 210. She said that the lower interest rate (which was actually variable) and the payment amount flexibility were valuable advantages not available under their existing loan. *Id. ¶* 210. She also said that – unlike their previous loans – the interest rate on the new loan was tied to an index with historically low rates that continued to decrease. *Id.* She said that industry experts predicted that interest rates would continue to fall, and Plaintiffs' monthly payments would be even lower than the initial payments. *Id.* Even in the worst case scenario of an interest-rate increase, she said that the increase would have a negligible effect on their monthly payments. *Id.* ¶ 211. The PICK-A-PAYMENT interest plan allowed interest to be deferred and added to the principal amount of the loan. *Id.* ¶ 212.

On August 29, 2006, the Graybills submitted a partially completed application for a new loan in the principal amount of $635,000 with a variable interest rate that initially was 7.605 percent per annum and gave it to Rufenacht for processing. *Id.* ¶¶ 208, 224. Later, Rufenacht or another World Savings representative altered the Graybills' loan application by falsely adding $135,000 in assets to the list of assets on the application: (1) a $15,000 Toyota automobile; (2) a $20,000 GMC truck; and (3) $100,000 in furniture and fixtures. *Id.* ¶¶ 225-27. Based on a statement that Rufenacht made to John Graybill later, Plaintiffs believe that she falsified the information. *Id.* ¶ 226. In addition, someone inflated the value of their home by $5,000 on the altered loan application, an appraisal, or both (resulting in a value of $795,000 instead of $790,000). *Id.* ¶¶ 228-29.

On December 15, 2006, the refinancing was completed, and the consolidated mortgage value was $609,120 (the "2006 Loan"). *Id.* ¶¶ 14-15. Approximately $9,000 of the principal balance was for fees and costs associated with the application and processing of the new loan. *Id.* ¶ 220. The Graybills allege the following:

- The costs and interest on the new loan were motivations for World Savings to disregard borrowers' interests. *Id. ¶* 221.

UNITED STATES DISTRICT COURT
For the Northern District of California

- Rufenacht acted as a financial advisor and outside of her "loan officer" role when she advised Plaintiffs that the Pick-a-Payment Loan was best for them, and she was motivated by the bank's interests in "selling" the loan. *Id.* ¶¶ 213-18, 221.

- Rufenacht had been trained and encouraged by World Savings to "act as an investment advisor in order to sell borrowers a new loan from World Savings." *Id.* ¶ 216.

- The advice that she provided the Graybills "was false and misleading, not so much as to the terms of the loan but as to loan [*sic*] being appropriate for the Plaintiffs." *Id.* ¶ 217.

The Graybills learned that Rufenacht's representations and omissions about the PICK-A-PAYMENT loan – boiling down to, it was a good financial move for them – were false only in April 2009, when they could no longer make full payments on the loan. *Id.* ¶ 223. They learned of the altered application only in July 2012, "when they found an altered application form that had been sent back to them by World Savings after the close of their 2006 loan refinance." *Id.* ¶¶ 231, 234.

**C. The 2009 Loan Modification Efforts and the 2010 Modification**

After April 2009 through 2011, the Graybills were unable to make the full payments due on their mortgage that Wells Fargo was servicing. *Id.* ¶¶ 27, 29. In July 2009, Mrs. Goff-Graybill contacted a Wells Fargo representative to "discuss the fact that she was then unable to make a full payment on the 2006 loan and that she was able to make only a partial payment." *Id.* ¶ 30. The Wells Fargo representative "informed her that it would be best for the Plaintiffs to not make any payments if they could not make full payments" and that "Wells Fargo would not consider modifying their mortgage unless they, the Plaintiffs, were in default on their mortgage payments." *Id.* ¶ 31. After that advice, the Graybills stopped making their mortgage payments and began to communicate with Wells Fargo about a modification of the terms of the 2006 loan. *Id.* ¶ 32.

In August 2009, the Graybills began working to modify the 2006 loan with Mark Stuart, a Wells Fargo representative in Novato, California. *Id.* ¶ 33-34. On Stuart's suggestion, in September 2009, the Graybills applied for a loan modification under Wells Fargo's Mortgage Assistance Program 2 ("MAP2R"). *Id.* ¶¶ 35-36. In March 2010, the Graybills' application was approved, and they began making reduced payments under the MAP2R loan modification plan in April 2010. *Id.* ¶¶ 37-38.

"After making reduced payments pursuant to the MAP2R loan modification," Mrs. Goff-Graybill "was injured in a motor vehicle accident and was not physically and mentally able to continue working and earning income." *Id.* ¶ 38. Due to Mrs. Goff-Graybill's disability, the

1    Graybills were unable to make their payments under the MAP2R program.  *Id.* ¶ 39.  After their

2    default, Plaintiffs were gradually able to earn more money, and their household income increased to

3    the point that they were again eligible for a loan modification.  *Id.* ¶ 43.

4        **D.   The 2011 Application For a HAMP Loan Modification**

5        At the beginning of 2011, Plaintiffs applied for a loan modification under HAMP.  *Id.* ¶ 44.

6    When they applied for the modification, "Wells Fargo had previously notified Plaintiffs of their

7    default on their mortgage payments as they had not been making full payments on their mortgage

8    loan."  *Id.* ¶ 45.  Indeed, on April 1, 2011, a notice of default was recorded based on Plaintiffs'

9    previous default on their payments as of July 2010.  Request for Judicial Notice Ex. G, ECF No. 24.

10   On or about June 29, 2011, a notice of trustee's sale on the Graybills' home was recorded and the

11   sale was scheduled for July 26, 2011.  *Id.* ¶ 46.

12       On or about July 12, 2011, the Graybills were contacted by Wade Stoltz, "who introduced

13   himself as a home preservation specialist of Wachovia Home Mortgage and as their sole contact to

14   lead the Plaintiffs through the HAMP loan modification process."  *Id.* ¶ 47.  Stoltz told the Graybills

15   that he personally would help them "every step of the way" and told Mr. Graybill what documents

16   and information were necessary to apply for a HAMP modification.  *Id.*  On or about July 14 and 15,

17   2011, the Graybills faxed Stoltz the completed HAMP loan application, all necessary accompanying

18   documents, and additional documents that Stolz requested on July 15, 2011.  *Id.* ¶¶ 49-50.  Mr. Stolz

19   sent them a letter on July 16, 2011 again saying that he was their primary contact and would

20   personally assist them with the loan modification process.  *Id.* ¶ 51.  Once the Graybills submitted

21   their application for a HAMP modification, the pending foreclosure sale was suspended.  *Id.* ¶ 53.

22       Plaintiffs allege that Stolz and Wells Fargo "knew or should have known" that his statements

23   orally and in writing were not true.  *Id.* ¶ 155.

24       On or about July 16, 2011, the Graybills received two letters from Sharon Zuniga, identified as a

25   Senior Vice President at Wachovia.  *Id.* ¶ 52.  One letter reiterated what Wade Stolz had conveyed to

26   them, and another dated July 13, 2011 (the "July 13 letter") stated in part:

27           If you do not qualify for HAMP, or if you fail to qualify with the terms of the Trial Period
             Plan, you will be sent a Non-Approval notice.  In most cases you will have 30 days to review
28           the reason for the non-approval and contact us to discuss any concerns you may have.  If

1   your loan has been previously referred to foreclosure, during this 30 day review period we
2   may continue with pending foreclosure action, but no foreclosure sale will be conducted and
    you will not lose your home.

3   *Id.* ¶ 52; *see id.* Ex. 3.

4       Within a few weeks, the Graybills learned that Wachovia had denied their application. First, on

5   August 10, 2011, a Wachovia representative called them from phone number 210-543-4000 to say

6   that their application had been denied and that they had 30 days to contest the figures underlying the

7   decision. *Id.* ¶ 54. Then on or about August 13, 2011, the Graybills received a notice of non-

8   approval letter from Sharon Zuniga dated August 3, 2011 (the "August 3 letter") stating:

9       Even though you are ineligible for assistance under the [HAMP Program], you have 30
        calendar days from the date of this notice to contact Wachovia Mortgage to discuss the
10      reason for non-approval for a HAMP modification or to discuss alternative loss mitigation
        options . . . . You may be referred to foreclosure during this time and any pending foreclosure
11      action may continue. However, no foreclosure sale will be conducted and you will not lose
        your home in this 30-day period (or any longer period required for us to review supplemental
12      material you may provide in response to this Notice).

13  *Id.* ¶ 55; *see id.* Ex. 4.

14      The Graybills obtained and provided an appraisal of their home to show that Wachovia's

15  calculations had underestimated the net present value ("NPV") of their home, and Wachovia

16  received it on September 1, 2011. *Id.* ¶ 56. Wachovia sent a letter confirming receipt of the

17  information and saying that it would reconsider their eligibility for a HAMP loan modification. *Id.*

18  ¶ 57. On September 6, 2011, Mr. Graybill contacted a Wachovia representative called Vickie

19  Weldon, who told him that she had received the information, she expected to have a decision by

20  September 30, 2011, "if that decision was not favorable, the Plaintiffs would then have thirty days to

21  again dispute the NPV determination and submit other documentation to contest the non-approval,"

22  and the house would not be scheduled for a foreclosure sale while the information was being

23  considered (or during the 30-day dispute process if the NPV was again determined to be negative."

24  *Id.* ¶ 58. She also told him that the Graybills could not apply for another loan modification program

25  while their appeal was pending. *Id.* ¶¶ 58-59. (Plaintiffs assert that Vickie Weldon and Wells Fargo

26  "knew or should have known" that Weldon's statements were not true. *Id.* ¶¶ 157-18.)

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

C 12-05802 LB (ORDER)

7

On October 7 or 8, 2011, the Graybills received notice[3] from Wells Fargo (dated September 27, 2011) that their appeal had been denied and they were ineligible for the HAMP loan modification. *Id.* ¶ 60; *see id.* Ex. 5 (letter attached to SAC). Nothing on the notice said that a foreclosure sale had been scheduled. *Id.* ¶ 60 & Ex. 5. The notice said that the reason for the non-approval was a negative NPV determination. *Id.* ¶ 61. The Graybills studied the criteria disclosed in the notice about the denial and "noticed significant errors that effected [*sic*] their eligibility for a HAMP loan modification." *Id.* ¶ 62. The Graybills relied on the statements previously made to them in writing and verbally by Wells Fargo representatives that the Graybills had 30 days from the Notice of Non-Approval to show that the decision had been made in error and that if they submitted supplemental information, Wells Fargo would reconsider their application for a HAMP modification. *Id.* ¶ 63.

Plaintiffs identified errors in the calculation of the negative NPV and began to gather evidence that this conclusion was erroneous and that Wells Fargo should reconsider their application. *Id.* ¶ 64. Had the NPV been calculated properly, they allege, they would have been eligible for a HAMP loan modification. *Id.* ¶ 65. They tried to contact Wells Fargo Bank to discuss the reasons for non-approval and the errors Plaintiffs had identified. *Id.* ¶ 67. They also consulted an expert who reviewed Wells Fargo's calculations and found "critical errors in the factors that Wells Fargo used in making the incorrect determination that plaintiffs were not then eligible for a HAMP loan modification." *Id.* ¶ 81.

On October 19, 2011, they received an advertising mailer showing that their home was scheduled for foreclosure on October 26, 2011, which was their first notice of the foreclosure. *Id.* ¶ 67. They tried calling Wells Fargo, but the telephone numbers that the Wells Fargo representatives provided them previously "were no longer connecting them to those representatives or to anyone who had any knowledge of there [*sic*] HAMP application. *Id.* ¶ 68. They called on October 20 and October 21, using the numbers that Wells Fargo "had reassigned to them" and tried calling other telephone numbers and left messages. *Id.* ¶ 70. On October 21, 2011, they spoke to someone in the

---

[3] As discussed below, a Wells Fargo representative later asserted that the notice was sent by courier on September 27, 2011, but the Graybills dispute that assertion. *Id.* ¶¶ 79-80.

1  loan department who was unable to give them any information about their loan or foreclosure but

2  did give them the telephone number of the legal department. *Id.* ¶ 72. That day, they spoke to

3  someone in the legal department who told them that she could not find any information about the

4  loan on Wells Fargo's system. *Id.* ¶ 73. Plaintiffs have records of their calls to document this. *Id.* ¶

5  74.

6      On October 26, 2011, Wells Fargo sold and purchased the Graybills' home at a foreclosure

7  auction for "$522,500, an amount $112,500 less than the $635,000 amount used by Wells Fargo to

8  determine the NPV which Plaintiffs attempted to dispute." *Id.* ¶ 75; *see* Request for Judicial Notice,

9  Ex. H, ECF No. 24. This foreclosure sale happened before the Graybills were able to contact a

10 Wells Fargo representative to discuss the September 27, 2011 notice of non-approval and the errors

11 in the NPV calculation. SAC ¶ 76. Also, "Plaintiffs' home was not sold to a third party without

12 notice of the defects in the foreclosure proceeding." *Id.* ¶ 77.

13     After the sale, a Wells Fargo representative told Plaintiffs that they had sent a copy of the Non-

14 Approval notice by courier on September 27, 2011, which was 29 days before the sale. *Id.* ¶ 79.

15 Plaintiffs allege that "Wells Fargo did not send any notice to Plaintiffs by courier." *Id.* ¶ 80.

16     Wells Fargo brought eviction proceedings against the Plaintiffs and obtained a judgment for

17 possession of the Property. *Id.* ¶ 82. The Graybills were evicted on July 24, 2012. *Id.* ¶ 83; see

18 Request for Judicial Notice Ex. J, ECF No. 24.

19 **E. Breaches of the HAMP Agreement and Plaintiffs' Status as Third-Party Beneficiaries**

20     The Servicer Participation Agreement ("SPA") that Wells Fargo entered into with Fannie Mae

21 provides that the Servicer, Wells Fargo Bank:

22     shall perform the services for all mortgage loans it services, whether it services such
       mortgage loans for its own account or for the account of another party, including any holders
23     of mortgage-backed securities (each such other party, an "Investor"). . . . The . . . Servicer . .
       . shall use reasonable efforts to remove all prohibitions or impediments to its authority, and
24     use reasonable efforts to obtain all third party consents and waivers that are required, by
       contract or law, in order to effectuate any modification of a mortgage loan under the
25     Program.

26

27 SAC, ECF No. 21, ¶ 42; *id.* Ex. 1 at 2, ¶ 2A. The SPA required Wells Fargo to take reasonable

28 efforts to remove impediments to its authority and secure all third party consents and waivers that

UNITED STATES DISTRICT COURT
For the Northern District of California

1    are required in order to effectuate any modification.  *Id.* ¶ 42.  The SPA also provides that the

2    Servicer shall follow the regulation in the related HAMP Servicer Handbook ("SPA Handbook").

3    *Id.* ¶ 86; *see* SAC Ex. 2 (Excerpts from the relevant SPA Handbook dated September 1, 2011).  The

4    foreword to the SPA Handbook states: "This Handbook constituted Program Documentation under

5    the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation

6    Agreement."  SAC, ECF No. 21, ¶ 87; *see* SAC Ex. 2 at 11.

7         The SPA Handbook sets forth the procedures that servicers must follow in the HAMP program,

8    *see id.* ¶ 88 & Ex. 2, including the following:

9    •    Provide a toll-free number where a borrower can reach a representative capable of providing
          specific details about the HAMP modification process.  *See id.* ¶ 92 & Ex. 2, § 2.1 at 54.

10

11   •    Have written procedures to provide timely and appropriate responses to borrowers' inquiries
          and complaints about HAMP within the timelines in the handbook, including a process to
          escalate disagreements to a supervisory level where a separate review of the borrower's

12        eligibility or qualification can be performed.  *See id.* ¶ 93 & Ex. 2, § 2.1 at 54.

13   •    Inform the borrower in clear language that during the HAMP evaluation, the home will not
          be referred for foreclosure, or, if the foreclosure process has been initiated, the home will not

14        be sold at a foreclosure sale.  *See id.* ¶ 94 & Ex. 2, § 2.2.2 at 56.

15   For borrowers who have not been approved for a HAMP modification, the servicer must:

16   •    Inform the borrower of the non-approval and provide a notice that complies with Handbook
          section 2.3, Borrower Notices, including (a) a toll-free number that allows the borrower to

17        reach a representative capable of providing specific details about the contents of the notice
          and the reason for non-approval, and (b) a description of alternatives to a foreclosure sale.

18        *See id.* ¶¶ 95-97 & Ex. 2, §§ 2.3, 2.3.1, & 2.3.2, at 57-58.

19   •    "[N]ot conduct a foreclosure sale within the 30 calendar days after the date of a Non-
          Approval Notice or any longer period required to review the supplemental material provided

20        by the borrower in response to a Non-Approval Notice unless the reason for non-approval is
          (1) ineligible mortgage, (2) ineligible property, (3) offer not accepted by borrower / request

21        withdrawn, or (4) the loan was previously modified under HAMP.  *See id.* ¶ 98 & Ex. 2,
          § 2.3.2, at 58,

22

23   •    If the servicer performed an NPV evaluation (regardless of whether a negative NPV was the
          reason for denial of the modification), list in the non-approval notice (a) the "Data Input

24        Fields and Values used in the NPV" so that the borrower has the opportunity to correct
          values that may impact the assessment of the borrower's equity and (b) email and mailing

25        address contact information for the servicer.  *See id.* ¶¶ 99-100 & Ex. 2, § 2.3.2, at 58.

26   •    Mail the non-approval notice no later than 10 business days after the servicer's determination
          that a trial payment plan or permanent HAMP modification will not be offered.  *See id.* ¶ 101

27        & Ex. 2, § 2.3.2, at 58.

28   •    If the borrower is not approved for a trial payment plan because the transaction is NPV
          negative, (a) give the borrower 30 days from the date of the Non-Approval Notice to submit

written evidence that the NPV values are inaccurate, and (b) if the borrower identifies material inaccuracies in the NPV value, do not conduct a foreclosure sale until the inaccuracies are reconciled. *Id.* ¶ 102 & Ex. 2, § 2.3.2.1, at 59.

- If a borrower submits a request for HAMP consideration after a foreclosure sale has been scheduled, and the request has been submitted no later than midnight on the 7th business day before the foreclosure sale, suspend the deadline as necessary to evaluate the borrower for HAMP. *See id.* ¶ 103 & Ex. 2, § 3.3, at 63.

Plaintiffs also assert that Wells Fargo was required under the handbook to assign them a relationship manager after they applied for the HAMP modification, and the relationship manager should have been available to them when their loan was referred for foreclosure so that Plaintiffs could communicate with Wells Fargo to resolve issues about the foreclosure such as the NPV determination and Plaintiffs' dispute of the NPV factors. *Id.* ¶ 104. Plaintiffs assert that their mortgage was eligible for a HAMP modification. *See id.* ¶ 105.

Plaintiffs allege that they are beneficiaries of the SPA contract (that incorporates the handbook into its terms), that the "stated and obvious purpose of the HAMP modification process is to benefit home mortgage borrowers," and that they are intended third-party beneficiaries. *Id.* ¶¶ 109-12 (citing Handbook, Ex. 2 and the HAMP website). They assert that Wells Fargo breached the contract by doing the following:

- While servicing the 2006 loan and processing Plaintiffs' application for a HAMP modification, not adhering to the requirements for its participation in the HAMP program and not following the specific requirements of the handbook set forth above. *Id.* ¶ 113.

- (1) Not carefully reviewing the information that Plaintiffs provided for the determination of their eligibility for a HAMP modification, (2) not allowing Plaintiffs 30 days from the September 27, 2011 notice of non-approval to contact a knowledgeable bank representative to discuss the reasons for non-approval and "alternative loss mitigation options; (3) not allowing Plaintiffs 30 days from the September 27 notice to submit a dispute of the NPV determination; (4) proceeding with a foreclosure sale during the 30 days after the September 27 notice of non-approval; and (5) proceeding with the foreclosure sale without considering any supplemental information Plaintiffs could have submitted to dispute the NPV determination. *Id.* ¶ 114.

- Not allowing Plaintiffs 30 days from September 27, 2011 to submit supplemental information to show they were eligible for a HAMP modification before Wells Fargo sold the home. *Id.* ¶ 115.

- Failing to provide a specific phone number so that Plaintiffs – within the 30 days from September 27, 2011 – could contact a knowledgeable Wells Fargo representative to discuss the reason for the non-approval and alternative foreclosure options and to whom they could submit a dispute of the NPV determination. *Id.* ¶ 116.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

- Failing to assign a relationship manager to Plaintiffs who would have continued to be available to Plaintiffs during foreclosure so that they could discuss and resolve disputes related to the foreclosure, including the NPV determination and the NPV factors. *Id.* ¶ 117.

- After the September 27, 2011 determination of Plaintiffs' ineligibility for a HAMP modification, failing to send Plaintiffs a notice of non-approval that complied with the Handbook's requirements. *Id.* ¶ 118.

**F. Breaches of Plaintiffs' Agreement with Wells Fargo and Promissory Estoppel**

Plaintiffs also assert that the HAMP modification process established a contract between them and Wells Fargo, and Wells Fargo breached it. *First*, they agreed to apply for a HAMP modification to extend their payment obligations in lieu of a foreclosure sale (and to include documents) (and they note that the foreclosure sale might not have been in Wells Fargo's financial interest). *Id.* ¶¶ 122, 125. *Second*, Wells Fargo agreed to consider the application and "fairly determine Plaintiffs' eligibility for a HAMP modification," and deal with them in terms set forth in the letter dated July 13, 2011 and the notice of non-approval dated August 3, 2011 (including the promises therein about time periods for appeals and no foreclosures, *see supra* p. 6, and by promising to be "here to help you" via a toll-free number). *Id.* ¶¶ 122-24. *Third*, Wells Fargo would offer them a HAMP modification if they were eligible. *Id.* ¶ 125. *Fourth*, if they were not, Well Fargo would allow Plaintiffs 30 days to contact a knowledgeable representative at a specific telephone number to discuss the reasons for their non-approval, to dispute the determination, to submit a written request to have the NPV recalculated, and to discuss alternatives such as an in-house loan modification, a short sale, or a deed in lieu of foreclosure. *Id.* *Fifth*, no foreclosure would occur during the 30-day period after the notice of non-approval, and during that time period, Wells Fargo would accept and review Plaintiffs' supplemental material. *Id.* *Sixth*, Wells Fargo would conduct a new NPV evaluation based on Plaintiffs' new material. *Id.* *Seventh*, Wells Fargo would not foreclose during the time it needed to review the supplemental material. *Id.*

Plaintiffs alleged Wells Fargo breached this contract by doing the following: (1) not carefully reviewing the information that Plaintiffs submitted for the HAMP loan modification determination; (2) not giving Plaintiffs 30 days from the September 27, 2011 notice of non-approval to contact a Wells Fargo representative to discuss the reasons for non-approval and alternative mitigation options; (3) not allowing Plaintiffs 30 days from September 27, 2011 to submit a dispute of the NPV

1    determination; (4) proceeding with a foreclosure during the 30 days after the September 27, 2011

2    notice of non-approval; and (5) foreclosing without considering any supplemental information

3    Plaintiffs could have submitted to dispute the NPV determination.  *Id.* ¶ 126.

4        Plaintiffs also assert that they relied on these false promises, which were made to induce them to

5    believe that they had an opportunity to secure a loan modification, and had they known that a

6    foreclosure sale would be conducted, they would have tried to call a Wells Fargo representative

7    before October 19, 2011 (when it was too late to avoid foreclosure) and tried to secure a TRO.  *Id.*

8    ¶ 131-35.

9        As damages, the Graybills lost their home and the opportunity to avoid foreclosure, and they

10   suffered emotional distress, the costs of moving, and the costs and fees of this lawsuit.  *Id.* ¶ 127.

11   **II.  PROCEDURAL HISTORY**

12       The Graybills filed suit against Wells Fargo in state court on July 20, 2012 and amended their

13   complaint there on November 2, 2013.  *See* Notice of Removal Exs. A, ECF No. 1 at 17, & B, ECF

14   No. 1 at 98.  Wells Fargo removed the case to federal court on November 9, 2012.  *See* Notice of

15   Removal, ECF No. 1.  Wells Fargo filed a motion to dismiss, the parties stipulated that the Graybills

16   could amend their complaint, Plaintiffs filed their SAC, and Wells Fargo then moved to dismiss it.

17   *See* ECF Nos. 5, 20, 21, and 23.

18                              **ANALYSIS**

19       The Graybills assert eight claims:  (1) breach of a third-party contract (the HAMP contract); (2)

20   breach of contract; (3) promissory estoppel; (4) violation of California's unfair competition law, Cal.

21   Bus. & Prof. Code § 17200; (5) fraud; (6) negligence; (7) declaratory and injunctive relief; and (8)

22   fraud and misrepresentation.  *Id.* at 22-57.  Wells Fargo moves to dismiss all claims under Federal

23   Rule of Civil Procedure 12(b)(6) and – for the fraud claims – failure to allege fraud with

24   particularity.  The court sets forth the legal standards and then addresses the claims.

25   **I.  LEGAL STANDARDS**

26       A complaint must contain a "short and plain statement of the claim showing that the pleader is

27   entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint must therefore provide a defendant with

28   "fair notice" of the claims against it and the grounds for relief.  *See Bell Atlantic Corp. v. Twombly,*

UNITED STATES DISTRICT COURT
For the Northern District of California

1   550 U.S. 544, 555 (2007) (quotation and citation omitted).

2       A complaint must contain sufficient factual matter, accepted as true, to state a claim for relief

3   that is plausible on its face. *See id.* "A claim has facial plausibility when the plaintiff pleads factual

4   content that allows the court to draw the reasonable inference that the defendant is liable for the

5   misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is

6   not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant

7   has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a

8   Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

9   provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

10  formulaic recitation of the elements of a cause of action will not do. Factual allegations must be

11  enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal

12  citations and parentheticals omitted).

13      In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true

14  and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus,* 551

15  U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

16      A plaintiff must state claims grounded in fraud with particularity. Fed. R. Civ. P. 9(b).

17  "Averments of fraud must be accompanied by the 'who, what, when, where, and how' of the

18  misconduct charged." *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003). Rule

19  9(b) applies to cases brought in federal court irrespective of whether the substantive law is state or

20  federal. *Id.* at 1102. Therefore, in an action based on state law, while a district court will rely on the

21  applicable state law to ascertain the elements of fraud that a party must plead, it will also follow

22  Rule 9(b) in requiring that the circumstances of the fraud be pleaded with particularity. *Kearns v.*

23  *Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Even when fraud is not a necessary element

24  of the claim, a plaintiff may still allege that the defendant's conduct was fraudulent. Such

25  allegations can take two forms: (1) the plaintiff may allege a unified course of fraudulent conduct, in

26  which case the claim is deemed to be "grounded in fraud," or (2) the plaintiff may allege some

27  fraudulent and some non-fraudulent conduct. *Vess*, 317 F.3d at 1103-04. In the first case, when the

28  claim is "grounded in fraud," the pleading of that claim as a whole is subject to Rule 9(b)'s

particularity requirement. *Id.* at 1104. In the second instance, only the allegations of fraudulent

conduct must satisfy the heightened pleading requirement, while the remaining allegations are

subject to the normal pleading standard of Rule 8(a). *Id.* at 1104-05. "Because a dismissal of a . . .

claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a

dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner." *Id.* at

1107.

## II. CLAIMS

### A. Breach of Contract (Third-Party Beneficiary) and Breach of Contract (Claims 1 and 2)

The Graybills have two contract claims: (1) breach of the SPA contract between Wells Fargo and

Fannie Mae, and they assert they are third-party beneficiaries; and (2) breach of their contract

formed by their course of dealing with Wells Fargo.

#### *1. Breach of Third-Party Contract (Claim 1)*

The Graybills assert that they are third-party beneficiaries of the SPA between Wells Fargo and

Fannie Mae. *See* SAC, ECF No. 21, ¶¶ 109-11. Wells Fargo disagrees, arguing that they are only

incidental beneficiaries who cannot sue for any breach of the SPA. *See* Mot., ECF No. 23 at 13-15.

The Ninth Circuit has not addressed the issue. The weight of authority holds that borrowers are only

incidental beneficiaries of this type of HAMP contract. The court agrees with the analysis in those

cases and grants Wells Fargo's motion to dismiss this claim.

Third-party beneficiaries to a contract can either be intended or incidental beneficiaries, but only

intended beneficiaries "gain rights against the promisor." *Hoffman v. Bank of America, N.A.,* No

C10-2171 SI, 2010 WL 2635773 (N.D. Cal. June 30, 2010) (citing *Klamath Water Users Protective

Ass'n v. Patterson,* 204 F.3d 1206, 1211 (9th Cir. 1999)). As one district court explained:

> One way to distinguish between incidental and intended beneficiaries is whether "the
> beneficiary would be reasonable in relying on the promise as manifesting an intention to
> confer a right" on the beneficiary. Restatement (Second) of Contracts, § 302. The
> requirement of clear intent "is not satisfied by a contract's recitation of interested
> constituencies, vague hortatory pronouncements, statements of purpose, explicit reference to
> a third party, or even a showing that the contract operates to the third parties' benefits and
> was entered into with them in mind." *County of Santa Clara* [*v. Astra USA, Inc.*]*,* 588 F.3d
> [1237,] 1244–45 [(9th Cir. 1999)]. In the context of government contracts, such as HAMP,
> there is a presumption that any beneficiaries are only incidental beneficiaries. "Parties that
> benefit from a government contract are generally assumed to be incidental beneficiaries, and
> may not enforce the contract absent a clear intent to the contrary." *Klamath Water Users*

UNITED STATES DISTRICT COURT
For the Northern District of California

1    *Protective Ass'n v. Patterson,* 204 F.3d 1206, 1211 (9th Cir.1999).

2    *Hammonds v. Aurora Loan Services LLC*, No. EDCV 10-1025 AG (OPx), 2010 WL 3859069, at *3

3    (C.D. Cal. Sep. 27, 2010).

4         Nearly all of the courts considering whether borrowers are intended beneficiaries of HAMP

5    contracts like the SPA at issue here have determined that they are not.  *See, e.g., Zierolf v. Wachovia*

6    *Mortgage Hoffman v. Bank of America, N.A.*, No. C 10-2171 SI, 2010 WL 2635773, at *3 (N.D. Cal.

7    June 30, 2010) (collecting cases).  The *Hoffman* court summarized those decisions, stating, "[a]s

8    many courts have recognized, it would be unreasonable for a qualified borrower seeking a loan

9    modification to rely on the HAMP servicer's agreement as granting him enforceable rights since the

10   agreement does not actually require that the servicer modify all eligible loans, nor does any of the

11   other language of the contract demonstrate that the borrowers are intended beneficiaries." *Hoffman,*

12   2010 WL 2635773, at *4.

13        Plaintiffs do a good job analyzing non-HAMP cases that hold that Plaintiffs are third-party

14   beneficiaries.  But those cases, which involve airline safety or price ceilings on pharmaceuticals, are

15   very different examples about when someone is an intended beneficiary.  By contrast, other courts

16   have rejected arguments that the SPA contract shows an intent to benefit persons such as the

17   Graybills.  The court appreciates Plaintiffs' point that these courts got it wrong, but the court agrees

18   with the weight of authority that there is insufficient evidence of intent to overcome the presumption

19   that borrowers are only incidental beneficiaries.  *See, e.g., Hoffman*, 2010 WL 2635773, at *1

20   (holding plaintiff lacked third-party standing to bring a breach of contract claim based on allegations

21   nearly identical to those here); *Bond v. Cal. W. Reconveyance Corp.*, No. C12-01523 HRL, 2012

22   WL 2150313 (N.D. Cal. June 12, 2012) (same); *Kennedy v. Bank of Am., N.A.*, No. 12-CV-952

23   YGR, 2012 WL 1458196 (N.D. Cal. Apr. 26, 2012) (same). [4]

24

25        [4] In one case, the court found that borrowers are intended beneficiaries under HAMP.  *See*
     *Marques v. Wells Fargo Home Mortg.*, No. 09-CV-1985-L (RBB), 2010 WL 3212131 (S.D. Cal.
26   Aug. 12, 2010).  This decision is in the clear minority, and other courts within this district have
     declined to follow it.  *See Ansanelli v. JP Morgan Chase Bank, N.A.*, No. C 10–03892 WHA, 2011
27   WL 1134451, at *6 (N.D. Cal. Mar. 28, 2011) ("One such decision in the face of many others to the
     contrary is not persuasive, especially because *Marques*'s analysis of the third-party beneficiary issue
28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The court dismisses claim one with prejudice.

2        **2. *Breach of Contract (Claim 2)***

3        Under California law, "'a contract requires parties capable of consent, the consent of those

4    parties, a lawful object, and sufficient consideration.'" *Banaga v. Taylor Bean Mortgage*, No. C 11

5    40007 JSC, 2011 WL 5056985, at *3 (N.D. Cal. 2011) (quoting *ASP Properties Group v. Fard, Inc.*,

6    133 Cal. App. 4th 1257, 1268-69 (2004)).

7        To state a claim for breach of contract, a plaintiff must show the following: (1) a contract

8    existed; (2) the plaintiff performed his duties or was excused from performing his duties under the

9    contract; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of

10   that breach. *See First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001).

11   "Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be

12   pleaded with specificity." *See Levy v. State Farm Mut. Auto. Ins. Co.*, 150 Cal. App. 4th 1, 5 (2007).

13       The Graybills claim that Wells Fargo breached a contract that was formed during the HAMP

14   loan modification application process. SAC, ECF No. 21, ¶¶ 122-28.

15       As to the existence of the agreement, they allege that it was established as follows: (1) Plaintiffs

16   agreed to apply for a HAMP modification in lieu of a foreclosure (and foreclosure may not have

17   been in Wells Fargo's interests); (2) Wells Fargo agreed to consider the application in accordance

18   with the terms of the July 13, 2011 letter and August 3, 2011 notice of ineligibility (attached to the

19   complaint as Exhibits 3 and 4);[5] (3) Wells Fargo would offer them a HAMP modification if they

20   _____

21   was dicta, as the court eventually held that plaintiff had failed to put forth sufficient factual
     allegations to state a breach of contract claim and therefore dismissed the same."); *Orcilla v. Bank of*

22   *America, N.A.*, No. C10-03931 HRL, 2010 WL 5211507, at *3 n.2 (N.D. Cal. Dec.16, 2010)
     ("While the court in [*Marques*] laid out a reasoned decision in denying a motion dismiss, this Court

23   nevertheless disagrees with its conclusion as to the plaintiffs' status as an intended beneficiary.").

24   This court also declines to do so.

25       [5]  The specific terms of the August 3 notice are excerpted above on page 5, which quotes the

26   SAC ¶ 44 and Exhibit 4, and the promises include the promises that Plaintiffs had 30 days to contest
     Wells Fargo's decision of ineligibility and that Wells Fargo would not foreclose on their home (and

27   Plaintiffs would not lose it), during this period or any longer period required for review of
     supplemental material provided by Plaintiffs in response to the notice. The complaint does a fair

28   amount of reiterating points, and this point is also captured in some of the other elements of the

C 12-05802 LB (ORDER)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    were eligible; (4) if they were not eligible, Wells Fargo would provide the 30-day period to contact a

2    representative at the dedicated phone number required by the HAMP handbook to dispute the NPV

3    calculation and to discuss alternatives to foreclosure; (5) Wells Fargo would not foreclose during the

4    30-day period after the notice of non-approval and would accept and review Plaintiffs' additional

5    information; (6) Wells Fargo would conduct a new NPV evaluation based on Plaintiffs' new

6    submissions; and (7) Wells Fargo would not foreclose during the 30 days from the August 3 notice

7    and during any additional time period it needed to review the supplemental material. *Id.* (citing

8    SAC ¶ 122-25).

9      As to breach, Plaintiffs allege that Wells Fargo breached the contract by the following: (1) not

10    carefully reviewing and considering their information in their HAMP application; (2) not giving

11    them 30 days from the September 27 Notice to discuss their options with a Wells Fargo

12    representative before the foreclosure; (3) not giving them 30 days from the September 27 Notice to

13    dispute the NPV evaluation; (4) foreclosing on the Property less than 30 days after the September 27

14    Notice; and (5) foreclosing on the Property without considering any supplemental information that

15    the Graybills could have submitted to dispute the NPV determination. *See supra* at 12-13

16    (summarizing SAC ¶ 126). As damages, the Graybills lost their home and the opportunity to avoid

17    foreclosure, and they suffered emotional distress, the costs of moving, and the costs and fees of this

18    lawsuit. *Id.* ¶ 127.

19      Wells Fargo responds that there was no agreement and no consideration, and it fully performed

20    any contract by considering the application. *See* Mot., ECF No. 23 at 15-17.

21      Wells Fargo first argues – without citing any legal authority – that the allegations in the SAC do

22    not establish a contract because it was only an agreement to negotiate: "This was not a binding

23    contract. At best, plaintiffs agreed to submit a proposal to modify their existing contact [*sic*] and

24    Wells Fargo agreed to review that proposal. The 'agreement' was nothing more than an agreement

25    to enter into negotiations and is not a binding contract." Mot., ECF No. 23 at 15. But Plaintiffs

26    characterize the July 13, 2011 letter as a breach of particular promises made to them – the explicit

27

28    contract that Plaintiffs allege in the SAC and that the court summarizes here.

C 12-05802 LB (ORDER)

UNITED STATES DISTRICT COURT
For the Northern District of California

1   promise to them in writing that the Wells Fargo would consider their application in accordance with

2   HAMP guidelines – to induce them to apply for a loan modification.  That being said, the July 13,

3   2011 letter is merely a description of the HAMP loan modification process.  It cannot be that such a

4   letter about a program creates a binding contract, even considering the complaint's allegations about

5   what bank employees said about the process.  *See Banaga*, 2011 WL 5056985, at *3-*4 (reaching

6   this conclusion); *cf. Phipps v. Wells Fargo Bank*, 2011 WL 302803, * 11-12 (E.D. Cal. 2011)

7   (breach of contract claim based on breach of promises to work with borrower and forbear from

8   foreclosing fails at pleadings stage in part because of absence of facts to show borrower's eligibility

9   for loan modification).[6]

10      Also, as Wells Fargo next argues, that there is no consideration.  Mot., ECF No. 23 at 15.

11      Under California law, "good consideration" to support a contract is:

12          Any benefit conferred, or agreed to be conferred, upon the promisor, by any other
            person, to which the promisor is not lawfully entitled, or any prejudice suffered, or
13          agreed to be suffered, by such person, other than such as he is at the time of consent
            lawfully bound to suffer, as an inducement to the promisor . . . .
14

15   Cal. Civ. Code § 1605.  "Generally speaking, a commitment to perform a preexisting contractual

16   obligation has no value.  In contractual parlance, for example, doing or promising to do something

17   one is already legally bound to do cannot constitute the consideration needed to support a binding

18   contract."  *Auerbach v. Great W. Bank*, 74 Cal. App. 4th, 1172, 1185 (1999) (citations omitted).

19      On the other hand, "[u]nder California law, consideration exists even if the performance due

20   'consists almost wholly of a performance that is already required and that this performance is the

21   main object of the promisor's desire.  It is enough that some small additional performance is

22   bargained for and given. . . .  [It is sufficient] if the act or forebearance given or promised as

23   consideration differs in any way from what was previously due.'"  *Ansanelli v. JP Morgan Chase

24   Bank, N.A.*, No. C 10–03892 WHA, 2011 WL 1134451, at *4 (quoting *House v. Lala*, 214 Cal. App.

25   2d 238, 243 (1963)) (finding that consideration existed for where bank agreed to offer a modification

26

27

28          [6]  Parties should provide case citations or say so if there are no cases.  Not making any
        argument suggests that there is not one.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   if plaintiffs complied with a TPP agreement and made financial disclosure not required under

2   original mortgage contract); *see Wigod v. Wells Fargo Bank*, 637 F.3d 547, 564 (7th Cir. 2012) (TPP

3   at issue in that case was supported by consideration because the borrower agreed to "open new

4   escrow accounts, to undergo credit counseling (if asked), and to provide and vouch for the truth of

5   her financial information"); *Lucia v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 1059, 1067 (N.D. Cal.

6   2011) ("additional consideration suffered was the credit consequences of [plaintiffs'] partial

7   mortgage payments and fulfilling the burdensome documentation requirements of the loan

8   modification approval process").

9       Here, the Graybills allege that they submitted information to Wells Fargo, Wells Fargo agreed to

10  consider that information according to certain procedures, and they applied in consideration for

11  Wells Fargo's promises to consider their application.  *See* SAC, ECF No. 21, ¶¶ 122, 125; Opp'n,

12  ECF No. 25 at 18.  Unlike the cases where Plaintiffs forego other financing options or pay a filing

13  fee, nothing in the FAC supports a plausible inference that Plaintiffs provided any consideration.

14  *See Banaga*, 2011 WL 5056985, at *3-*4.

15      The court dismisses claim two with leave to amend.

16  **B.  Promissory Estoppel (Claim 3)**

17      Under California law, "[a] promise which the promisor should reasonably expect to induce

18  action or forbearance on the part of the promisee or a third person and which does induce such

19  action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

20  *See Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000).

21  Promissory estoppel is an equitable doctrine whose remedy may be limited "as justice so requires."

22  *See id.*  The elements of promissory estoppel are: "(1) a clear promise; (2) reasonable and

23  foreseeable reliance by the party to whom the promise is made; (3) injury (meaning, substantial

24  detriment); and (4) damages 'measured by the extent of the obligation assumed and not performed.'"

25  *See Errico v. Pacific Capital Bank, N.A.*, 753 F. Supp. 2d 1034, 1048 (N.D. Cal. 2010) (citing and

26  quoting *Poway Royal Mobilehome Owners Ass'n. v. City of Poway*, 149 Cal. App. 4th 1460, 1470

27  (2007)).

28      The Graybills' promissory estoppel claim rests on their same allegations supporting their

UNITED STATES DISTRICT COURT
For the Northern District of California

contract claim, meaning, Wells Fargo did not consider their application fairly, offer them a

modification if they were eligible, and comply with the 30-day appeal and forbearance time periods.

*See* SAC, ECF No. 21, ¶ 131. Again, the "promise" in the July letter is merely a summary of the

HAMP process and is not a clear promise that creates an enforceable obligation. Moreover, the

complaint's allegations do not show reasonable and foreseeable reliance. In *Nong v. Wells Fargo*

*Bank, N.A.*, the Central District of California dismissed a similar complaint where a plaintiff alleged

promissory estoppel. No. CV 10-1538 JVS (MLGx), 2010 U.S. Dist. LEXIS 136464, at *8-9 (C.D.

Cal. Dec. 6, 2010). There, the plaintiff alleged that she detrimentally relied on Wells Fargo's

promises to grant her a HAMP loan modification "by not pursuing other strategies to avoid

foreclosure." *Id.* The court dismissed the promissory estoppel claim as insufficiently pleaded. *Id.*

The court reasoned:

> where a plaintiff does not allege facts that could establish that she would have been
> successful in delaying the foreclosure sale, renegotiating her loan, and retaining possession
> of her home, dismissal is proper because the Complaint lacks a connection between her
> reliance on the alleged promise and losing her home to sustain her claim for estoppel.

*Id.* (quoting *Newgent*, 2010 WL 761236, at *7) (internal quotations omitted). The court finds this

reasoning persuasive here.

The court dismisses claim three with leave to amend.

**C. Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 (Claim 4)**

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. &

Prof. Code § 17200. "Since section 17200 is [written] in the disjunctive, it establishes three separate

types of unfair competition. The statute prohibits practices that are either 'unfair' or 'unlawful,' or

'fraudulent.'" *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003); *see also Cel–Tech*

*Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). To support a

claim for a violation of the UCL, a plaintiff cannot simply rely on general common law principles.

*Textron Fin. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 118 Cal. App. 4th 1061, 1072 (2004).

The UCL also incorporates other laws and treats violations of those laws as unlawful business

practices independently actionable under state law. *Chabner v. United Omaha Life Ins. Co.*, 225

F.3d 1042, 1048 (9th Cir. 2000). Violation of almost any federal, state, or local law may serve as

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the basis for a UCL claim. *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994).  In

2   addition, a business practice may be "unfair or fraudulent in violation of the UCL even if the

3   practice does not violate any law." *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 827 (2003).

4        Any individual who has "has suffered injury in fact and has lost money or property as a result of

5   the unfair competition" may initiate suit.  Cal. Bus. & Prof. Code § 17204.  To have standing, a

6   plaintiff must sufficiently allege that (1) he has "lost 'money or property' sufficient to constitute an

7   'injury in fact' under Article III of the Constitution" and (2) there is a "causal connection" between

8   the defendant's alleged UCL violation and the plaintiff's injury in fact. *Rubio v. Capital One Bank,*

9   613 F.3d 1195, 1203-04 (9th Cir. 2010) (citations omitted).

10       Here, the Graybills allege violations under all three prongs of the UCL.  *See* SAC, ECF No. 21,

11   ¶¶ 141-68.

12       As to the unlawful prong, the Graybills' unlawful UCL claim is predicated on Wells Fargo's not

13   adhering to the requirements of HAMP.  SAC, ECF No. 21, ¶¶ 145-47).  There is no private right of

14   action under HAMP, and the UCL cannot create a private right of action where none exists under the

15   federal statute. *See Lucia v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 1059, 1072 (N.D. Cal. 2011);

16   *Aleem v. Bank of America,* No. CV 09-01812-VAP (Rzx), 2010 WL 532330, at *3 (C.D. Cal. Feb. 9,

17   2010) (citing *Summit Tech., Inc. v. High–Line Med. Instruments Co., Inc.,* 922 F. Supp. 299, 316

18   (C.D. Cal. 1996)).

19       As to the unfair prong, the Graybills do not plead any facts about unfairness.

20       As to the fraud prong, a plaintiff must allege facts showing that members of the public are likely

21   to be deceived by the alleged fraudulent business practice. *See Morgan v. AT&T Wireless Servs.,*

22   *Inc.*, 177 Cal. App. 4th 1235, 1255 (2009); *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th

23   1255, 1275 (2006).  Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements

24   applies to allegations of fraud in support of a section 17200 claim. *See Long v. Hewlett-Packard*

25   *Co.*, No C 06-2616 JW, 2007 WL4877691, at *3 (N.D. Cal. Dec. 21, 2006).

26       Wells Fargo contends that the Graybills' claims fail as insufficiently pleaded and because they

27   "do not describe a scheme intended to victimize the public." Mot., ECF No. 23 at 22.  The Graybills

28   do not substantively oppose Wells Fargo's argument. *See* Opp'n, ECF No., 25 at 25.  Instead, they

1 argue that the fraud alleged in the SAC "was part of a scheme well known to Wells Fargo." *Id.* The

2 court agrees that the Graybills did not explain victimization of the public or plead fraud with

3 particularity (as discussed below in the sections addressing fraud).

4   The court dismisses claim four with leave to amend.

5   **D. Fraud (Claim 5)**

6   "The elements of a cause of action for fraud in California are: '(a) misrepresentation (false

7 representation, concealment, or nondisclosure ); (b) knowledge of falsity (or 'scienter'); (c) intent to

8 defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *Kearns v. Ford*

9 *Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (quoting *Engalla v. Permanente Med. Group, Inc.*,

10 15 Cal. 4th 951, 974 (1997)). As described above, under Federal Rule of Civil Procedure 9(b), a

11 party must plead with particularity the circumstances constituting fraud.

12   In claim five, the Graybills allege common-law fraud based on Wells Fargo representatives'

13 allegedly false assertions that they had sent the notice of non-approval by courier on September 27,

14 2011 to justify the foreclosure 30 days from that date. *See* SAC, ECF No. 21, ¶¶ 172, 174. Also,

15 they allege fraud in the foreclosure and purchase of their house by Wells Fargo "in that Wells Fargo

16 tried to make it appear that the re-sale of the Eastwood home was to a third party without notice of

17 the defects in the foreclosure sale of that home when in fact it was not, for the purpose of defeating

18 an attempt by Plaintiffs to regain title to and possession of that home." SAC ¶ 176; *see also id.* ¶¶

19 155-59 (alleging that Wade Stoltz, Sharon Zuniga, and Vickie Weldon made untrue statements about

20 the HAMP modification process).

21   As to the allegations about Stolz, Zuniga, and Weldon, their statements are only representations

22 about Hamp procedures and are not the heightened allegations that establish intent to defraud.

23   As to the allegedly false statements about a courier and the effect on the foreclosure date, there

24 are no allegations that the unnamed speaker knew the statement was false or that it was intended to

25 defraud. Also, the reference to "a Wells Fargo representative" does not satisfy the heightened

26 pleading requirement. *See* SAC, ECF No. 21, ¶ 172.

27   The court dismisses claim five with leave to amend.

28

**E.  Negligence (Claim 6)**

The elements of a negligence claim are as follows:  (1) a duty to exercise due care; (2) breach of that duty; (3) causation; and (4) damages.  *See Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 500 (2001).  Lenders do not owe borrowers a duty of care unless their involvement in the loan transaction exceeds the scope of their "conventional role as a mere lender of money."  *See Nymark v. Heart Fed. Savings & Loan Ass'n*, 231 Cal. App. 3d 1089, 1095-96 (1991) (citations omitted).  To determine whether the institution exceeded the scope of its conventional role as a lender of money, courts must balance the following factors:

> [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

*Id.* at 1098.

The Graybills allege that Wells Fargo "assumed duties of care to the Plaintiffs that went beyond the usual lender and borrower relationship" when it "undertook to provide [them] with an opportunity for a HAMP modification," "informed the Plaintiffs of the HAMP application process and . . . how that process would and would not affect a foreclosure sale of the Plaintiffs' home . . . ."  *Id.* ¶¶ 182-83.  The SAC further alleges that Wells Fargo had several duties of care towards the Graybills that correspond to the bases for their other claims, e.g. "a duty of care to inform them that their home might be sold at a foreclosure sale during the thirty days after a determination had been made that Plaintiffs' 2006 was NPV negative."  *See id.* ¶¶ 183-90.

These allegations do not establish a duty of care beyond Wells Fargo's conventional role as lender.

The court dismisses claim six with leave to amend.

**F.  Declaratory Relief (Claim 7)**

 Plaintiffs allege that Wells Fargo did not have a right to foreclose or evict them based on its violations of the HAMP procedures.  SAC ¶¶ 200-205.  Because the court dismisses the HAMP-based claims, it dismisses the declaratory relief claim too.  *See Urbano v. Bank of America, N.A.*, C 12-00464 AWI, 2013 WL 359655, at * 9 (E.D. Cal. Jan. 29, 2013).

UNITED STATES DISTRICT COURT
For the Northern District of California

### G. Fraud and Misrepresentation (Claim 8)

The Graybills also allege fraud surrounding the 2006 refinancing of their loan.  *See* SAC, ECF No. 21, ¶¶ 206-45; *see supra* at 3-4). The alleged fraud is from statements that loan officer Patricia Rufenacht made to them regarding the advisability of a refinance under the PICK-A-PAYMENT plan. *See id.* ¶¶ 206-14 (alleging that she said that it was the best plan, that the interest rate was tied to an index with historically low rates, that industry experts predicted interest rates would fall, and that a worst-case-scenario rise in interest rates would have only a negligible effect on their payments).  They also allege unauthorized alterations by Rufenacht or another Wells Fargo representative to their loan application that inflated assets by $135,000 and added $5,00 to the value of their home). *Id.* ¶¶ 225-29.  Finally, they allege that the incentives – including the $9,000 costs associated with the refinance – were motivators that resulted in Rufenacht acting outside her normal lender role. *Id.* ¶¶ 216-21.

Wells Fargo argues that the claim is barred by the statute of limitations and not pleaded with particularity. Mot., ECF No. 23 at 29-33.

#### 1. *Statute of Limitations*

The statute of limitations for fraud is three years.  *See* Cal. Code Civ. P. § 338(d).  The Graybills allege that they did not learn that their loan application had been altered until July 2012 "when they found an altered application form that had been sent back to them by World Savings after the closing of thir 2006 loan refinance."  SAC, ECF No. 21, ¶ 231.  They also allege that they knew that Rufenacht's advice was bad in April 2009, when they could no longer make loan payments. *Id.* ¶ 223.    Statute of limitations arguments are affirmative defenses that are often inappropriate to resolve at the pleading stage.  Still, "[a] defendant is permitted to raise a statute of limitations argument in a 12(b)(6) motion provided the basis for the argument appears on the face of the complaint and any materials the court is permitted to take judicial notice of."  *Hernandez v. Sutter W. Capital*, No. C 09-03658 CRB, 2010 WL 3385046 (N.D. Cal. Aug. 26, 2010) (granting motion to dismiss on statute of limitations grounds based on judicially-noticed dates); *Low v. City of Sacramento*, No. 2:10-CV-01624 JAM, 2011 WL 2935858, at *4 (E.D. Cal. July 18, 2011).

To the extent that the claim is based on bad advice, and pled only as a fraud claim (as opposed to

UNITED STATES DISTRICT COURT
For the Northern District of California

1   a breach of fiduciary duties, which might be subject to a four-year statute of limitations under Cal.

2   Code Civ. P. § 343), the claim is time-barred because the Graybills allege that they knew the advice

3   was bad in April 2009 and filed their lawsuit more than three years later on July 20, 2012.

4       To the extent that the claim is based on the altered loan application, the facts as pled do not

5   establish tolling of the statute of limitations.

6       The doctrine of equitable tolling may, in the appropriate circumstances, suspend the statute of

7   limitations until the borrower discovers or has the reasonable opportunity to discover the fraud or

8   non-disclosures that form the basis of the claim. *See King v. State of California*, 784 F.2d 910, 915

9   (9th Cir. 1986). "The inquiry is "whether there was excusable delay by the plaintiff: If a reasonable

10  plaintiff would not have known of the existence of a possible claim within the limitations period,

11  then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff

12  can gather what information he needs." *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002)

13  (internal quotation marks omitted).

14      Here, Plaintiffs allege that they discovered the alteration in July 2012, but the allegation suggests

15  they had the altered application after World Bank approved the 2006 refinancing. The allegation

16  does not establish excusable neglect, but Plaintiffs possibly could add context to establish it.

17              ***2. Whether the SAC Sufficiently Pleads A Fraud Claim***

18      Wells Fargo argues that the claim of fraud based on the altered application fails because Wells

19  Fargo was defrauded, not the Graybills. *See* Mot., ECF No. 23 at 32-33. It also argues that the

20  Graybills cannot plead justifiable reliance or damages under this theory. *Id.* at 33. The court agrees

21  that the SAC fails to plead detrimental reliance. As to the "bad advice" claim, as pled, it does not

22  allege fraud with particularity. Also, as it is pleaded now, the claim does not allege conduct on the

23  "bad advice" theory beyond the ordinary role of a lender.[7] The court dismisses claim eight with

24  leave to amend.

25

26  _____

27      [7] Given the court's conclusion that the allegations about the 2006 refinancing do not state a

28  claim, the court does not reach Wells Fargo's argument that the "bad advice" claim also is
    preempted under the Home Owners Loan Act (HOLA), 12 U.S.C. § 1461 *et seq.*

**CONCLUSION**

The court dismisses claim one with prejudice and claims two through eight without prejudice.

Plaintiffs may file an amended complaint within 28 days. This disposes of ECF No. 23.

**IT IS SO ORDERED.**

Dated: March 12, 2013



_____
LAUREL BEELER
United States Magistrate Judge

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28