UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

JOHN R. GRAYBILL, and PATRICIA GOFF-GRAYBILL

               Plaintiffs,

    v.

WELLS FARGO BANK, N.A.,

               Defendant.

_____/

No. C 12-05802 LB

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

[ECF No. 34]

### INTRODUCTION

Plaintiffs John R. Graybill and Patricia Goff-Graybill (the "Graybills") filed this lawsuit against Wells Fargo Bank raising eight claims stemming from Wells Fargo's actions regarding their mortgage loan, their 2006 refinancing of it, their 2009 attempts to modify the loan under the Home Affordable Modification Program ("HAMP"), and the foreclosure of their house: (1) breach of contract; (2) promissory estoppel; (3) fraud; (4) violation of California's unfair competition law, Cal. Bus. & Prof. Code § 17200; (5) negligence; (6) declaratory relief; (7) fraud and breach of fiduciary duty in the sale of the loan; and (8) fraud in the alteration of Plaintiffs' loan application.  Third Amended Complaint ("TAC"), ECF No. 33.[1]  Wells Fargo moved to dismiss the TAC.  *See* Motion, ECF No. 34.  The court finds the matter suitable for determination without oral argument under Civil

_____

[1]  Citations to the Electronic Case File ("ECF") have pin cites to the electronically-generated page number at the top of the document.

1   Local Rule 7-1(b) and GRANTS the motion with prejudice.

2   **STATEMENT**

3   **I. FACTUAL BACKGROUND**

4   From November 1987 to July 23, 2012, the Graybills, who are married, lived at their home at

5   608 Eastwood Way, Mill Valley, California.  Third Amended Complaint ("TAC"), ECF No. 33, ¶ 5.

6   This case involves their loan refinancing in 2006 with World Bank and their attempts to secure a

7   HAMP loan modification in 2011 with World Bank's successor, Wachovia/Wells Fargo.  *See id.*

8   Through "all times pertinent" to the TAC, Wells Fargo has claimed that it had the right to service

9   and collect on the loan.  *Id.* ¶ 25.

10   This section first reviews the history of World Bank/Wachovia/Wells Fargo and then

11   summarizes the complaint's allegations about the refinancings and the attempted loan modification

12   under HAMP.

13   **A.  The Defendant Wells Fargo Bank**[2]

14   World Bank changed its name to Wachovia Mortgage on December 21, 2007.  *Id.* ¶ 16.  Wells

15   Fargo agreed to buy Wachovia in October 2008 and then completed the purchase in January 2009.

16   *Id.* ¶ 17.  On November 1, 2009, Wachovia converted to a national bank called Wells Fargo Bank

17

18   ――――――――――

19   [2] Defendants ask the court to take judicial notice of the following: (1) the deed of trust for the Graybills' property; (2) the Certificate of Corporate Existence of World Savings Bank, FSB issued by the Office of Thrift Supervision ("OTS"); (3) a letter from the OTS reflecting the name change from World Savings Bank, FSB, to Wachovia Mortgage, FSB; (4) Wachovia Mortgage, FSB's charter, signed by the OTS; (5) the Official Certification of the Comptroller of the Currency ("OCC") reflecting Wachovia Mortgage, FSB's conversion to Wells Fargo Bank Southwest, N.A. and merged into Wells Fargo Bank, N.A.; (6) a print-out from the FDIC's website regarding the history of Wachovia Mortgage; (7) the notice of default and intent to sell the Graybills' homes; (8) the notice of trustee's sale dated June 27, 2011 and recorded June 29, 2011; (9) the trustee's deed of sale dated November 2, 2011 and recorded November 4, 2011; and (10) the state court docket sheet.  *See* Def.'s Request for Judicial Notice ("RJN"), ECF No. 35; *id.* Exs. A-J.  Plaintiffs did not oppose any of these requests.  The court may take judicial notice of matters of public record like these, and undisputed facts in them, and records reflecting official acts of the Executive Branch, without converting a motion to dismiss into a motion for summary judgment.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *Hotel Employees & Rest. Employees Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 978 (N.D. Cal. 2005); Fed. R. Evid. 201(b).  The court previously took judicial notice of these documents in connection with Wells Fargo's previous motion to dismiss, *see* ECF No. 30 at 2, and does so again.

Southwest, NA, which then merged with and into Wells Fargo Bank, NA. *Id.* With the merger, ultimately the servicing of Plaintiffs' loans was taken over by Wells Fargo Home Mortgage, a division of Wells Fargo Bank. *Id.* ¶ 18. Plaintiffs' dealings with Wells Fargo during the years 2010 and 2011 were often with Wachovia and representatives of Wells Fargo Bank that were identified as representatives of Wachovia, and Wachovia's name appears on some of the documents discussed in the complaint and attached to it. *Id.* ¶ 21. Wells Fargo has also done business as America's Service Company ("ASC"). *Id.* ¶ 23.

On April 13, 2009, Wells Fargo, doing business as ASC, contracted with the Federal Mortgage National Association ("Fannie Mae"), in its capacity as financial agent of the United States, to provide foreclosure prevention services intended to provide homeowners with affordable loan modifications. *Id.* ¶¶ 26, 40-41; *see id.* Ex. 1 (copy of the contract or "Servicer Participation Agreement" ("SPA")). The SPA was titled the Commitment to Purchase Financial Instrument and Servicer Participation Contract for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008. *Id.* ¶ 40. Under the terms of the SPA, Wells Fargo was eligible to receive $2,873,000,000 in taxpayer funds. *Id.* ¶¶ 26, 85 ("Wells Fargo received consideration for its participation in the HAMP program"). In return, Wells Fargo agreed to perform certain loan modification and foreclosure prevention services "to benefit homeowners by providing them with affordable loan modifications." *Id.* ¶¶ 26, 40. These services, and the contract provisions that Wells Fargo allegedly violated, are discussed below.

**B. The 2006 Refinancing**

In 2005, the Graybills refinanced their home mortgage by taking out a loan from World Savings Bank, FSB ("World Savings"). *Id.* ¶ 12. They also had a second mortgage from World Savings. *See id.* ¶ 13. In August 2006, the Graybills owed $516,000 on their first mortgage and $74,200 on the second for a total of $590,200. *Id.* ¶¶ 12-13.

Around June or July 2006, World Savings solicited the Graybills to refinance their mortgage, and they began working with loan officer Patricia Rufenacht. *Id.* ¶ 223. One or both plaintiffs met with her in July and August 2006 for a total of about six time to complete an application, and she talked with them by phone a few times in August to persuade them to take out a loan to replace their

UNITED STATES DISTRICT COURT
For the Northern District of California

existing loan. *Id.* ¶ 224. During conversations in August 2008 in her office, Rufenacht falsely told Plaintiffs that it would be in their best interests to consolidate their two mortgages into one mortgage with a principal of $635,000. *Id.* ¶ 226. She "falsely informed and assured" them that the best interest plan for their new mortgage was be the "PICK-A-PAYMENT" plan. *Id.* ¶ 227. She said that the lower interest rate (which was actually variable) and the payment amount flexibility were valuable advantages not available under their existing loan. *Id.* She also said that – unlike their previous loans – the interest rate on the new loan was tied to an index with historically low rates that continued to decrease. *Id.* She said that industry experts predicted that interest rates would continue to fall, and Plaintiffs' monthly payments would be even lower than the initial payments. *Id.* Even in the worst case scenario of an interest-rate increase, she said that the increase would have a negligible effect on their monthly payments. *Id.* ¶ 228. The PICK-A-PAYMENT interest plan allowed interest to be deferred and added to the principal amount of the loan. *Id.* ¶ 229.

On or about August 29, 2006, the Graybills submitted a partially completed application for a new loan in the principal amount of $635,000 with a variable interest rate that initially was 7.605 percent per annum. *Id.* ¶¶ 225, 249.[3] Later, Rufenacht or another World Savings representative altered the Graybills' loan application by falsely adding $135,000 in assets to the list of assets on the application: (1) a $15,000 Toyota automobile; (2) a $20,000 GMC truck; and (3) $100,000 in furniture and fixtures. *Id.* ¶¶ 250-52. Based on a statement that Rufenacht made to John Graybill later, Plaintiffs believe that she falsified the information. *Id.* ¶ 251. In addition, someone inflated the value of their home by $5,000 on the altered loan application, an appraisal, or both (resulting in a value of $795,000 instead of $790,000). *Id.* ¶¶ 253-54. The Graybills "relied on the approval of their loan application as evidence that they were qualified for it, and that they would be able to make the payments on the loan." *Id.* ¶ 267.

On December 15, 2006, the refinancing was completed, and the consolidated mortgage value was $609,120 (the "2006 Loan"). *Id.* ¶¶ 14-15. Approximately $9,000 of the principal balance was

---

[3] Paragraphs 225 and 249 of the TAC appear to refer to the same loan application, though paragraph 225 states that the application was "partially completed" and paragraph 249 states that the Graybills "truthfully completed" the application.

for fees and costs associated with the application and processing of the new loan. *Id.* ¶ 241. The Graybills allege the following:

- The costs and interest on the new loan were motivations for World Savings to disregard borrowers' interests. *Id.* ¶ 242.

- Rufenacht acted as a financial advisor and outside of her "loan officer" role when she advised Plaintiffs that the Pick-a-Payment Loan was best for them, and she was motivated by the bank's interests in "selling" the loan. *Id.* ¶¶ 231-32, 236.

- Rufenacht had been trained and encouraged by World Savings to "act as an investment advisor in order to sell borrowers a new loan from World Savings." *Id.* ¶ 234.

- The advice that she provided the Graybills "was false and misleading, not so much as to the terms of the loan but as to loan [*sic*] being appropriate for the Plaintiffs." *Id.* ¶ 235.

The Graybills learned that Rufenacht's representations and omissions about the PICK-A-PAYMENT loan – boiling down to, it was a good financial move for them – were false only in April 2009, when they could no longer make full payments on the loan. *Id.* ¶ 244. They learned of the altered application only in July 2012, "when they found an altered application form that had been sent back to them by World Savings after the close of their 2006 loan refinance." *Id.* ¶¶ 256, 260-61.

### C. The 2009 Loan Modification Efforts and the 2010 Modification

After April 2009 through 2011, the Graybills were unable to make the full payments due on their mortgage that Wells Fargo was servicing. *Id.* ¶¶ 27, 29. In July 2009, Mrs. Goff-Graybill contacted a Wells Fargo representative to "discuss the fact that she was then unable to make a full payment on the 2006 loan and that she was able to make only a partial payment." *Id.* ¶ 30. The Wells Fargo representative "informed her that it would be best for the Plaintiffs to not make any payments if they could not make full payments" and that "Wells Fargo would not consider modifying their mortgage unless they, the Plaintiffs, were in default on their mortgage payments." *Id.* ¶ 31. After that advice, the Graybills stopped making their mortgage payments and began to communicate with Wells Fargo about a modification of the terms of the 2006 loan. *Id.* ¶ 32.

In August 2009, the Graybills began working to modify the 2006 loan with Mark Stuart, a Wells Fargo representative in Novato, California. *Id.* ¶ 33-34. On Stuart's suggestion, in September 2009, the Graybills applied for a loan modification under Wells Fargo's Mortgage Assistance Program 2

UNITED STATES DISTRICT COURT
For the Northern District of California

("MAP2R").  *Id.* ¶¶ 35-36.  In March 2010, the Graybills' application was approved, and they began making reduced payments under the MAP2R loan modification plan in April 2010.  *Id.* ¶¶ 37-38.

"After making reduced payments pursuant to the MAP2R loan modification," Mrs. Goff-Graybill "was injured in a motor vehicle accident and was not physically and mentally able to continue working and earning income."  *Id.* ¶ 38.  Due to Mrs. Goff-Graybill's disability, the Graybills were unable to make their payments under the MAP2R program.  *Id.* ¶ 39.  After their default, Plaintiffs were gradually able to earn more money, and their household income increased to the point that they were again eligible for a loan modification.  *Id.* ¶ 43.

### D.  The 2011 Application For a HAMP Loan Modification

At the beginning of 2011, Plaintiffs applied for a loan modification under HAMP.  *Id.* ¶ 44. When they applied for the modification, "Wells Fargo had previously notified Plaintiffs of their default on their mortgage payments as they had not been making full payments on their mortgage loan."  *Id.* ¶ 45.  Indeed, on April 1, 2011, a notice of default was recorded based on Plaintiffs' previous default on their payments as of July 2010.  Request for Judicial Notice Ex. G, ECF No. 24. On or about June 29, 2011, a notice of trustee's sale on the Graybills' home was recorded and the sale was scheduled for July 26, 2011.  *Id.* ¶ 46.

On or about July 12, 2011, the Graybills were contacted by Wade Stoltz, "who introduced himself as a home preservation specialist of Wachovia Home Mortgage and as their sole contact to lead the Plaintiffs through the HAMP loan modification process."  *Id.* ¶ 47.  Stoltz told the Graybills that he personally would help them "every step of the way" and told Mr. Graybill what documents and information were necessary to apply for a HAMP modification.  *Id.*  On or about July 14 and 15, 2011, the Graybills faxed Stoltz the completed HAMP loan application, all necessary accompanying documents, and additional documents that Stolz requested on July 15, 2011.  *Id.* ¶¶ 49-50.  Mr. Stolz sent them a letter on July 16, 2011 again saying that he was their primary contact and would personally assist them with the loan modification process.  *Id.* ¶ 51.  Once the Graybills submitted their application for a HAMP modification, the pending foreclosure sale was suspended.  *Id.* ¶ 53.

Plaintiffs allege that Stolz and Wells Fargo "knew or should have known" that his statements orally and in writing were not true.  *Id.* ¶ 147.

UNITED STATES DISTRICT COURT
For the Northern District of California

On or about July 16, 2011, the Graybills received two letters from Sharon Zuniga, identified as a Senior Vice President at Wachovia. *Id.* ¶ 52. One letter reiterated what Wade Stolz had conveyed to them, and another dated July 13, 2011 (the "July 13 letter") stated in part:

> If you do not qualify for HAMP, or if you fail to qualify with the terms of the Trial Period Plan, you will be sent a Non-Approval notice. In most cases you will have 30 days to review the reason for the non-approval and contact us to discuss any concerns you may have. If your loan has been previously referred to foreclosure, during this 30 day review period we may continue with pending foreclosure action, but no foreclosure sale will be conducted and you will not lose your home.

*Id.* ¶ 52; *see id.* Ex. 3.

Within a few weeks, the Graybills learned that Wachovia had denied their application. First, on August 10, 2011, a Wachovia representative called them from phone number 210-543-4000 to say that their application had been denied and that they had 30 days to contest the figures underlying the decision. *Id.* ¶ 54. Then on or about August 13, 2011, the Graybills received a notice of non-approval letter from Sharon Zuniga dated August 3, 2011 (the "August 3 Notice") stating:

> Even though you are ineligible for assistance under the [HAMP Program], you have 30 calendar days from the date of this notice to contact Wachovia Mortgage to discuss the reason for non-approval for a HAMP modification or to discuss alternative loss mitigation options . . . . You may be referred to foreclosure during this time and any pending foreclosure action may continue. However, no foreclosure sale will be conducted and you will not lose your home in this 30-day period (or any longer period required for us to review supplemental material you may provide in response to this Notice).

*Id.* ¶ 55; *see id.* Ex. 4.

The Graybills obtained and provided an appraisal of their home to show that Wachovia's calculations had underestimated the net present value ("NPV") of their home, and Wachovia received it on September 1, 2011. *Id.* ¶ 56. Wachovia sent a letter confirming receipt of the information and saying that it would reconsider their eligibility for a HAMP loan modification. *Id.* ¶ 57. On September 6, 2011, Mr. Graybill contacted a Wachovia representative called Vickie Weldon, who told him that she had received the information, she expected to have a decision by September 30, 2011, "if that decision was not favorable, the Plaintiffs would then have thirty days to again dispute the NPV determination and submit other documentation to contest the non-approval," and the house would not be scheduled for a foreclosure sale while the information was being considered (or during the 30-day dispute process if the NPV was again determined to be negative).

1   *Id.* ¶ 58.  She also told him that the Graybills could not apply for another loan modification program

2   while their appeal was pending.  *Id.* ¶¶ 58-59.  (Plaintiffs assert that Vickie Weldon and Wells Fargo

3   "knew or should have known" that Weldon's statements were not true.  *Id.* ¶ 149.)

4       On October 7 or 8, 2011, the Graybills received notice from Wells Fargo (dated September 27,

5   2011) that their appeal had been denied and they were ineligible for the HAMP loan modification.

6   *Id.* ¶ 60; *see id.* Ex. 5 (letter attached to TAC).  Nothing on the notice said that a foreclosure sale had

7   been scheduled.  *Id.* ¶ 60 & Ex. 5.  The notice said that the reason for the non-approval was a

8   negative NPV determination.  *Id.* ¶ 61.  The Graybills studied the criteria disclosed in the notice

9   about the denial and "noticed significant errors that effected [*sic*] their eligibility for a HAMP loan

10  modification."  *Id.* ¶ 62.  They then began to gather evidence to show that the determination of their

11  ineligibility had been made in error, that their application should be reconsidered, and they prepared

12  to discuss these inaccuracies with Wells Fargo (Wachovia).  *Id.* ¶ 63.  The Graybills relied on the

13  statements previously made to them in writing and verbally by Wells Fargo representatives that the

14  Graybills had 30 days from the Notice of Non-Approval to show that the decision had been made in

15  error and that if they submitted supplemental information, Wells Fargo would reconsider their

16  application for a HAMP modification.  *Id.* ¶ 64.

17      Had the NPV been calculated properly, they allege, they would have been eligible for a HAMP

18  loan modification.  *Id.* ¶ 65.  They tried to contact Wells Fargo Bank to discuss the reasons for non-

19  approval and the errors Plaintiffs had identified.  *Id.* ¶ 66.

20      On October 19, 2011, they received an advertising mailer showing that their home was

21  scheduled for foreclosure on October 26, 2011, which was their first notice of the foreclosure.  *Id.* ¶

22  67.  They tried calling Wells Fargo, but the telephone numbers that the Wells Fargo representatives

23  provided them previously "were no longer connecting them to those representatives or to anyone

24  who had any knowledge of there [*sic*] HAMP application.  *Id.* ¶ 68.  They called on October 20 and

25  October 21, using the numbers that Wells Fargo "had reassigned to them" and tried calling other

26  telephone numbers and left messages.  *Id.* ¶ 70.  On October 21, 2011, they spoke to someone in the

27  loan department who was unable to give them any information about their loan or foreclosure but

28  did give them the telephone number of the legal department.  *Id.* ¶ 72.  That day, they spoke to

UNITED STATES DISTRICT COURT
For the Northern District of California

someone in the legal department who told them that she could not find any information about the

loan on Wells Fargo's system. *Id. ¶ 73.*  Plaintiffs have records of their calls to document this. *Id. ¶*

74.

On October 26, 2011, Wells Fargo sold and purchased the Graybills' home at a foreclosure

auction for "$522,500, an amount $112,500 less than the $635,000 amount used by Wells Fargo to

determine the NPV which Plaintiffs attempted to dispute." *Id. ¶ 76; see* Request for Judicial Notice,

Ex. H.  This foreclosure sale happened before the Graybills were able to contact a Wells Fargo

representative to discuss the September 27, 2011 notice of non-approval and the errors in the NPV

calculation. TAC ¶ 77.  Also, "Plaintiffs' home was not sold to a third party without notice of the

defects in the foreclosure proceeding." *Id. ¶ 79.*

Wells Fargo brought eviction proceedings against the Plaintiffs and obtained a judgment for

possession of the Property. *Id. ¶ 81.*  The Graybills were evicted on July 24, 2012. *Id. ¶ 82; see*

Request for Judicial Notice Ex. J.

The Graybills consulted with Denise Thomas in order to help them avoid eviction by analyzing

the factors that were used to make the NPV determination. *Id. ¶ 84.*  On May 22, 2012 Wells Fargo

sent Ms. Thomas a letter signed by Jacob Johnson, "Executive Mortgage Specialist, Office of

Executive Complaints." *Id. ¶ 83.*  Mr. Johnson's letter is Exhibit 6 to the TAC, and it provides the

following chronology of the Graybills' pre-foreclosure NPV dispute:

> On July 11, 2011, a review for workout options was initiated.  On August 03, 2011, the
> borrowers were denied for the Federal Government's Home Affordable Modification
> Program (HAMP) due to negative net present value (NPV).
>
> . . . Correspondence regarding the NPV denial, including the variables used in the calculation
> to determine eligibility, was sent by courier to the borrowers on August 03, 2011.  I have
> enclosed is [*sic*] a copy for your reference.
>
> To allow the mortgagor time to review the NPV denial letter, WFHM was unable to continue
> reviewing your loan for alternative workout options for 30 calendar days to allow time for
> the mortgagor to dispute any of the inputs used in the review.  On August 26, 2011, WFHM
> received an NPV dispute from the mortgagor's requesting that they be reviewed again for
> HAMP.  The dispute received from the mortgagor disputed the property value used in the
> previous HAMP review.  On September 15, 2011, the mortgagor's were again reviewed for
> HAMP based on the property value they submitted and the review resulted in a denial due to
> negative NPV.  Correspondence regarding the NPV denial, including the variables used in the
> calculation to determine eligibility, was sent by courier to the mortgagor's on September
> 27, 2011, enclosed is a copy for your reference.  WFHM did nor receive any additional NPV
> disputes regarding any of the other inputs used in the HAMP review during the 30 days that

1    are given for the mortgagor's to dispute the results fo the HAMP review.

2       Since no viable plan was established before the foreclosure sale date of October 26, 2011,
        our action is valid and we deny your request to rescind the foreclosure sale.

3

4    TAC Ex. 6, ECF No. 33-6.

5       The Graybills deny that Wells Fargo sent them any notice by courier. *Id.* ¶ 85.  They also point

6    out that thirty days did not elapse between September 27, 2011 (when Wells Fargo claims to have

7    sent them the notice) and October 26, 2011, the foreclosure date. *Id.* ¶ 87.

8       **E.   Alleged Breaches of the HAMP Agreement**

9       The Servicer Participation Agreement ("SPA") that Wells Fargo entered into with Fannie Mae

10   provides that the Servicer, Wells Fargo Bank:

11      shall perform the services for all mortgage loans it services, whether it services such
        mortgage loans for its own account or for the account of another party, including any holders
12      of mortgage-backed securities (each such other party, an "Investor"). . . . The . . . Servicer . .
        . shall use reasonable efforts to remove all prohibitions or impediments to its authority, and
13      use reasonable efforts to obtain all third party consents and waivers that are required, by
        contract or law, in order to effectuate any modification of a mortgage loan under the
14      Program.

15   TAC, ECF No. 33, ¶ 42; *id.* Ex. 1 at 2, ¶ 2A.  The SPA required Wells Fargo to take reasonable

16   efforts to remove impediments to its authority and secure all third party consents and waivers that

17   are required in order to effectuate any modification. *Id.* ¶ 42.  The SPA also provides that the

18   Servicer shall follow the regulation in the related HAMP Servicer Handbook ("SPA Handbook").

19   *Id.* ¶ 91; *see* TAC Ex. 2 (excerpts from the relevant SPA Handbook dated September 1, 2011).  The

20   foreword to the SPA Handbook states: "This Handbook constituted Program Documentation under

21   the Servicer Participation Agreement and is incorporated by reference into the Servicer Participation

22   Agreement."  TAC, ECF No. 33, ¶ 92 ; *see* TAC Ex. 2 at 11.

23      The SPA Handbook sets forth the procedures that servicers must follow in the HAMP program,

24   *see id.* ¶ 98 & Ex. 2, including the following:

25   •   Provide a toll-free number where a borrower can reach a representative capable of providing
         specific details about the HAMP modification process. *See id.* ¶ 97 & Ex. 2, § 2.1 at 54.

26
     •   Have written procedures to provide timely and appropriate responses to borrowers' inquiries
27       and complaints about HAMP within the timelines in the handbook, including a process to
         escalate disagreements to a supervisory level where a separate review of the borrower's
28       eligibility or qualification can be performed. *See id.* ¶ 98 & Ex. 2, § 2.1 at 54.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

C 12-05802 LB (ORDER)                                    10

- Inform the borrower in clear language that during the HAMP evaluation, the home will not be referred for foreclosure, or, if the foreclosure process has been initiated, the home will not be sold at a foreclosure sale. *See id.* ¶ 99 & Ex. 2, § 2.2.2 at 56.

For borrowers who have not been approved for a HAMP modification, the servicer must:

- Inform the borrower of the non-approval and provide a notice that complies with Handbook section 2.3, Borrower Notices, including (a) a toll-free number that allows the borrower to reach a representative capable of providing specific details about the contents of the notice and the reason for non-approval, and (b) a description of alternatives to a foreclosure sale. *See id.* ¶¶ 100-02 & Ex. 2, §§ 2.3, 2.3.1, & 2.3.2, at 57-58.

- "[N]ot conduct a foreclosure sale within the 30 calendar days after the date of a Non-Approval Notice or any longer period required to review the supplemental material provided by the borrower in response to a Non-Approval Notice unless the reason for non-approval is (1) ineligible mortgage, (2) ineligible property, (3) offer not accepted by borrower / request withdrawn, or (4) the loan was previously modified under HAMP. *See id.* ¶ 103 & Ex. 2, § 2.3.2, at 58,

- If the servicer performed an NPV evaluation (regardless of whether a negative NPV was the reason for denial of the modification), list in the non-approval notice (a) the "Data Input Fields and Values used in the NPV" so that the borrower has the opportunity to correct values that may impact the assessment of the borrower's equity and (b) email and mailing address contact information for the servicer. *See id.* ¶¶ 104-05 & Ex. 2, § 2.3.2, at 58.

- Mail the non-approval notice no later than 10 business days after the servicer's determination that a trial payment plan or permanent HAMP modification will not be offered. *See id.* ¶ 106 & Ex. 2, § 2.3.2, at 58.

- If the borrower is not approved for a trial payment plan because the transaction is NPV negative, (a) give the borrower 30 days from the date of the Non-Approval Notice to submit written evidence that the NPV values are inaccurate, and (b) if the borrower identifies material inaccuracies in the NPV value, do not conduct a foreclosure sale until the inaccuracies are reconciled. *Id.* ¶ 107 & Ex. 2, § 2.3.2.1, at 59.

- If a borrower submits a request for HAMP consideration after a foreclosure sale has been scheduled, and the request has been submitted no later than midnight on the 7th business day before the foreclosure sale, suspend the deadline as necessary to evaluate the borrower for HAMP. *See id.* ¶ 108 & Ex. 2, § 3.3, at 63.

The Graybills also assert that Wells Fargo was required under the handbook to assign them a relationship manager after they applied for the HAMP modification, and the relationship manager should have been available to them when their loan was referred for foreclosure so that Plaintiffs could communicate with Wells Fargo to resolve issues about the foreclosure such as the NPV determination and Plaintiffs' dispute of the NPV factors. *Id.* ¶ 109. Plaintiffs assert that their mortgage was eligible for a HAMP modification. *See id.* ¶ 110.

**II. PROCEDURAL HISTORY**

The Graybills filed suit against Wells Fargo in state court on July 20, 2012 and amended their complaint there on November 2, 2013.  *See* Notice of Removal Exs. A, ECF No. 1 at 17, & B, ECF No. 1 at 98.  Wells Fargo removed the case to federal court on November 9, 2012.  *See* Notice of Removal, ECF No. 1.  Wells Fargo filed a motion to dismiss and the parties stipulated that the Graybills could amend their complaint.  *See* ECF Nos. 5 & 20.  After Plaintiffs filed their Second Amended Complaint, Wells Fargo again moved to dismiss it.  *See* ECF Nos. 21 & 23.  On March 12, 2013, the court granted Wells Fargo's motion to dismiss but gave the Graybills leave to amend all but one of their claims.  *See* Order, ECF No. 30.  The Graybills filed the Third Amended Complaint and Wells Fargo has again moved for dismissal.  *See* ECF Nos. 33 & 34.

**ANALYSIS**

The Graybills assert eight claims:  (1) breach of contract; (2) promissory estoppel; (3) fraud; (4) violation of California's unfair competition law, Cal. Bus. & Prof. Code § 17200; (5) negligence; (6) declaratory relief; (7) fraud and breach of fiduciary duty in the sale of the loan; and (8) fraud in the alteration of Plaintiffs' loan application.  Wells Fargo moves to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) and – for the fraud claims – failure to allege fraud with particularity.  The court sets forth the legal standards and then addresses the claims.

**I. LEGAL STANDARDS**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quotation and citation omitted).

A complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.  *See id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly,* 550 U.S. at 557).  "While a complaint attacked by a

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to

2    provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a

3    formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be

4    enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal

5    citations and parentheticals omitted).

6        In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true

7    and construe them in the light most favorable to the plaintiff.  *See id.* at 550; *Erickson v. Pardus,* 551

8    U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).

9        A plaintiff must state claims grounded in fraud with particularity.  Fed. R. Civ. P. 9(b).

10   "Averments of fraud must be accompanied by the 'who, what, when, where, and how' of the

11   misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  Rule

12   9(b) applies to cases brought in federal court irrespective of whether the substantive law is state or

13   federal.  *Id.* at 1102.  Therefore, in an action based on state law, while a district court will rely on the

14   applicable state law to ascertain the elements of fraud that a party must plead, it will also follow

15   Rule 9(b) in requiring that the circumstances of the fraud be pleaded with particularity.  *Kearns v.*

16   *Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).  Even when fraud is not a necessary element

17   of the claim, a plaintiff may still allege that the defendant's conduct was fraudulent.  Such

18   allegations can take two forms: (1) the plaintiff may allege a unified course of fraudulent conduct, in

19   which case the claim is deemed to be "grounded in fraud," or (2) the plaintiff may allege some

20   fraudulent and some non-fraudulent conduct.  *Vess*, 317 F.3d at 1103-04.  In the first case, when the

21   claim is "grounded in fraud," the pleading of that claim as a whole is subject to Rule 9(b)'s

22   particularity requirement.  *Id.* at 1104.  In the second instance, only the allegations of fraudulent

23   conduct must satisfy the heightened pleading requirement, while the remaining allegations are

24   subject to the normal pleading standard of Rule 8(a).  *Id.* at 1104-05.  "Because a dismissal of a . . .

25   claim grounded in fraud for failure to comply with Rule 9(b) has the same consequence as a

26   dismissal under Rule 12(b)(6), dismissals under the two rules are treated in the same manner."  *Id.* at

27   1107.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

## II. CLAIMS

### A. Breach of Contract

The Graybills first allege that Wells Fargo breached a contract with the Graybills that was formed by its course of dealing with them. Wells Fargo counters that there was no agreement, no consideration, that it was barred by the statute of frauds, and that its terms are too uncertain and that any damages are speculative or nonexistent.

Under California law, "'a contract requires parties capable of consent, the consent of those parties, a lawful object, and sufficient consideration.'" *Banaga v. Taylor Bean Mortgage*, No. C 11 40007 JSC, 2011 WL 5056985, at *3 (N.D. Cal. 2011) (quoting *ASP Properties Group v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1268-69 (2004)).

To state a claim for breach of contract, a plaintiff must show the following: (1) a contract existed; (2) the plaintiff performed his duties or was excused from performing his duties under the contract; (3) the defendant breached the contract; and (4) the plaintiff suffered damages as a result of that breach. *See First Commercial Mortgage Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001). "Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be pleaded with specificity." *See Levy v. State Farm Mut. Auto. Ins. Co.*, 150 Cal. App. 4th 1, 5 (2007).

The Graybills' contract claim is that the telephone calls and letters with Wade Stoltz and Sharon Zuniga constituted a firm offer that if they applied for a HAMP loan and submitted certain documents to Wells Fargo, then Wells Fargo would consider their application as follows. First, Wells Fargo would review their documents and application and fairly determine their eligibility for a HAMP modification. Second, if they were eligible, they would be offered a HAMP loan modification. Third, if Wells Fargo found that they were ineligible, then they would be allowed 30 calendar days "from the date of the notice of non-approval to dispute the determination and submit a written request to have their NPV recalculated" and discuss other alternatives. *Id.* ¶ 127. Fourth, during the 30-day period, no foreclosure would be conducted and the Graybills would not lose their home. Fifth, during the 30-day period, the Graybills could dispute the ineligibility determination and Wells Fargo would review any supplemental materials the Graybills provided. Sixth, Wells Fargo would conduct a new NPV evaluation based on those materials. Finally, no foreclosure sale

1   would occur while Wells Fargo was reviewing the supplemental materials. *See id.* ¶¶ 115-27.

2   As to breach, the Graybills allege that Wells Fargo breached the contract by the following: (1)

3   not carefully reviewing and considering their information in their HAMP application; (2) not giving

4   them 30 days from the September 27 Notice to discuss their options with a Wells Fargo

5   representative before the foreclosure; (3) not giving them 30 days from the September 27 Notice to

6   dispute the NPV evaluation; (4) foreclosing on the Property less than 30 days after the September 27

7   Notice; and (5) foreclosing on the Property without considering any supplemental information that

8   the Graybills could have submitted to dispute the NPV determination. *See id.* ¶ 128.

9   As damages, the Graybills allege that they lost their home and the opportunity to avoid

10  foreclosure, and they suffered emotional distress, the costs of moving, and the costs and fees of this

11  lawsuit. *Id.* ¶ 129.

12  Wells Fargo responds that there was no agreement and no consideration, it fully performed the

13  contract, it was an invalid oral agreement, it was too uncertain, and there are no damages. *See*

14  Motion, ECF No. 34 at 13-15. In dismissing the Second Amended Complaint ("SAC"), the court

15  agreed with many of these points. The breach of contract claim in Third Amended Complaint

16  contains no new allegations that change the result.

17  First, in dismissing the Graybills Second Amended Complaint, the court found that:

18     "the July 13 2011 letter is merely a description of the HAMP loan modification process. It
       cannot be that such a letter about a program creates a binding contract, even considering the
19     complaint's allegations about what bank employees said about the process. *See Banaga*,
       2011 WL 5056985, at *3-*4 (reaching this conclusion); *cf. Phipps v. Wells Fargo Bank*,
20     2011 WL 302803, * 11-12 (E.D. Cal. 2011) (breach of contract claim based on breach of
       promises to work with borrower and forbear from foreclosing fails at pleadings stage in part
21     because of absence of facts to show borrower's eligibility for loan modification).

22  Order, ECF No. 30 at 19. The Graybills' theory seems to have slightly shifted, and now they allege

23  that the August 3, 2011 Notice contained the allegedly operative contract terms. TAC, ¶ 127;

24  Opp'n, ECF No. 38 at 9. But the Graybills provide no basis for finding that the August 3, 2011

25  Notice is any more of a contract than the July 13 letter. While Wells Fargo may have promised not

26  to foreclose for 30 days (plus the time to review supplemental material submitted), that does not

27  render the promise legally enforceable. *See Banaga v. Taylor Bean Mortg. Co.*, No. 11-4007 (JSC),

28  2011 WL 5056985, at *3-*4 (N.D. Cal. Oct. 24, 2011).

UNITED STATES DISTRICT COURT
For the Northern District of California

The breach of contract claim independently fails for lack of consideration. The court's conclusion that the SAC failed to allege consideration to support a contract bars this claim, and the court adopts it again here. *See* Order, ECF No. 30 at 19-20. In opposition, the Graybills argue that the August 3, 3011 Notice was a separate contract supported by "new significant consideration in the form of an appraisal . . . ." Opp'n at 10. That argument is unpersuasive for the reasons stated in *Banaga*:

> To accept the premise that the very act of applying for a privilege to which one is not entitled creates a binding contract between the applicant and the reviewer is unprecedented and would lead to nonsensical results: each would-be barrista not hired after filling out an application at Starbucks and handing it to a Starbucks employee arguably would have the same contractual causes of action that Plaintiffs here allege.

2011 WL 5056985 at * 4.

Finally, any purported contract was never breached. Even if the August 3, 2011 Notice were a binding contract, Wells Fargo performed it. It is undisputed that Wells Fargo did not foreclose for 30 days, it ran a new NPV evaluation based on the Graybills' submissions, and it issued a new notice. Instead, the Graybills' theory is that the August 3, 2011 Notice gave them the right to repeatedly dispute Wells Fargo's determination and that foreclosure would be postponed for the duration of their appeals. They allege that a Wells Fargo representative named Vickie Weldon told them that on September 6, 2011 and that her statements are extrinsic evidence used to explain the meaning of a written instrument. *See* Opp'n at 9; TAC ¶¶ 58 & 125. That argument fails because it contradicts the unambiguous language of the instrument. The August 3, 2011 Notice states that if the Graybills provide Wells Fargo with an appraisal of their property value with supporting documentation, Wells Fargo will "preform a preliminary NPV evaluation using the property value you provide to us. If the preliminary NPV test is positive, we'll order a new appraisal for your property." Compl. Ex. 4, ECF No. 33-4 at 2. It tells them how to submit the requisite information and that if they do "[w]e'll write to you with our *final* decision on your loan modification based on the new NPV evaluation." *Id.* at 3 (emphasis added). The August 3, 2011 Notice unambiguously provided the Graybills with one opportunity to submit information before a final decision and the Graybills' extrinsic evidence would give it a meaning to which it is not reasonably susceptible. Accordingly, the court dismisses claim one.

UNITED STATES DISTRICT COURT
For the Northern District of California

### B.  Promissory Estoppel (Claim 2)

As in the SAC, the Graybills' promissory estoppel claim rests on their same allegations supporting their contract claim and fails for the reasons discussed in the court's previous order. *See* TAC, ¶¶ 131-41; Order, ECF No. 30 at 20-21.

Under California law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *See Kajima/Ray Wilson v. Los Angeles Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310 (2000). Promissory estoppel is an equitable doctrine whose remedy may be limited "as justice so requires." *See id.*  The elements of promissory estoppel are: "(1) a clear promise; (2) reasonable and foreseeable reliance by the party to whom the promise is made; (3) injury (meaning, substantial detriment); and (4) damages 'measured by the extent of the obligation assumed and not performed.'" *See Errico v. Pacific Capital Bank, N.A.*, 753 F. Supp. 2d 1034, 1048 (N.D. Cal. 2010) (citing and quoting *Poway Royal Mobilehome Owners Ass'n. v. City of Poway*, 149 Cal. App. 4th 1460, 1470 (2007)).

The Graybills claim that they reasonably relied on the alleged promise not to foreclose within 30 days of the September 27, 2011 notice that they were not approved for a HAMP modification.  *Id.*; *see* Opp'n at 13.  Even if a Wells Fargo representative told the Graybills that they could repeatedly dispute the bank's NPV determination and postpone foreclosure, their reliance would not be reasonable because that advice contradicts the unambiguous meaning of the documents.

The promissory estoppel claim is also insufficiently pleaded.  As the court previously explained in dismissing the SAC:

> In *Nong v. Wells Fargo Bank, N.A.*, the Central District of California dismissed a similar complaint where a plaintiff alleged promissory estoppel.  No. CV 10-1538 JVS (MLGx), 2010 U.S. Dist. LEXIS 136464, at *8-9 (C.D. Cal. Dec. 6, 2010).  There, the plaintiff alleged that she detrimentally relied on Wells Fargo's promises to grant her a HAMP loan modification "by not pursuing other strategies to avoid foreclosure."  *Id.*  The court dismissed the promissory estoppel claim as insufficiently pleaded.  *Id.*  The court reasoned:
>
>> where a plaintiff does not allege facts that could establish that she would have been successful in delaying the foreclosure sale, renegotiating her loan, and retaining possession of her home, dismissal is proper because the Complaint lacks a connection between her reliance on the alleged promise and losing her home to sustain her claim

1    for estoppel.

2    *Id.* (quoting *Newgent*, 2010 WL 761236, at *7) (internal quotations omitted).

3    Order, ECF No. 30 at 21.  In their opposition, the Graybills acknowledge the court's reliance on

4    *Nong*, state that they disagree with it, but provide no reasoned basis for distinguishing it.

5    Accordingly, the court dismisses the Graybills' promissory estoppel claim.

6    **C.  Fraud (Claim 3)**

7    "The elements of a cause of action for fraud in California are: '(a) misrepresentation (false

8    representation, concealment, or nondisclosure ); (b) knowledge of falsity (or 'scienter'); (c) intent to

9    defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage.'"  *Kearns v. Ford*

10   *Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (quoting *Engalla v. Permanente Med. Group, Inc.*,

11   15 Cal. 4th 951, 974 (1997)).  As described above, under Federal Rule of Civil Procedure 9(b), a

12   party must plead with particularity the circumstances constituting fraud.

13   In claim three, the Graybills allege common-law fraud based on the representations described

14   above that were made by Wade Stoltz, Sharon Zuniga, Vickie Weldon, and similar statements by

15   "Wells Fargo's representatives."  *See* TAC ¶¶ 144-60.  They also allege that Wells Fargo made

16   fraudulent claims in the prior unlawful detainer action against the Graybills by stating that it

17   provided them with 30 days notice that their HAMP application had been rejected 30 days before it

18   sold the home (and that such notice was required).  *See Id.* ¶ 161-65.

19   The court previously addressed the allegations regarding Stoltz, Zuniga, and Weldon and

20   dismissed them as "representations about HAMP procedures and . . . not the heightened allegations

21   that establish intent to defraud."  Order, ECF No. 30 at 23.  The court reaches the same conclusion

22   here.  Statements about "Wells Fargo's representatives" do not meet the Rule 9 pleading standard.

23   *Id.*  As for the allegations about Wells Fargo's representations in the unlawful detainer action, the

24   Graybills' remedy for such statements was to appeal that judgment, not to collaterally attack it in

25   federal court.  In any event, the Graybills fail to explain the basis for their contention that Wells

26   Fargo was barred from foreclosing until 30 days after the September 27, 2011 Notice, rather than

27   just 30 days after the August 3, 2011 Notice.  Nor do they plead how such alleged representations

28   damaged them.  Accordingly, the Graybill's fraud claim is dismissed.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.  Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 (Claim 4)**

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  "Since section 17200 is [written] in the disjunctive, it establishes three separate types of unfair competition.  The statute prohibits practices that are either 'unfair' or 'unlawful,' or 'fraudulent.'"  *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003); *see also Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  To support a claim for a violation of the UCL, a plaintiff cannot simply rely on general common law principles. *Textron Fin. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 118 Cal. App. 4th 1061, 1072 (2004).

The UCL also incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law.  *Chabner v. United Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000).  Violation of almost any federal, state, or local law may serve as the basis for a UCL claim.  *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994).  In addition, a business practice may be "unfair or fraudulent in violation of the UCL even if the practice does not violate any law."  *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 827 (2003).

Any individual who has "has suffered injury in fact and has lost money or property as a result of the unfair competition" may initiate suit.  Cal. Bus. & Prof. Code § 17204.  To have standing, a plaintiff must sufficiently allege that (1) he has "lost 'money or property' sufficient to constitute an 'injury in fact' under Article III of the Constitution" and (2) there is a "causal connection" between the defendant's alleged UCL violation and the plaintiff's injury in fact.  *Rubio v. Capital One Bank,* 613 F.3d 1195, 1203-04 (9th Cir. 2010) (citations omitted).

Here, the Graybills allege violations under all three prongs of the UCL.  *See* TAC, ECF No. 33, ¶¶ 141-68.  As to the unlawful prong, the Graybills' unlawful UCL claim is predicated on Wells Fargo's not adhering to the requirements of HAMP.  TAC, ECF No. 33, ¶¶ 97-109, 170-82.  The argument fails for multiple reasons.

First, the unlawful UCL claim fails on its merits because it is premised on their erroneous belief that the September 27, 2011 was a non-approval notice that they could dispute or discuss with the bank.  As discussed above, it was not.  The August 3, 2011 Notice was their non-approval notice and it contained the requisite bank contact information.  *See* Compl. Ex. 4.  The Graybills disputed their

1   NPV determination and Wells Fargo re-ran the numbers and did not foreclose until more than 30

2   days after the August 3, 2011 Notice.  The Graybills do not point to any law that gave them the right

3   to serially dispute the NPV determination.

4        The unlawful claim also fails because the Graybills do not identify a law that was violated.

5   Their claim is premised on Wells Fargo's allegedly not following the guidelines in the HAMP

6   Handbook attached as Exhibit 2 to their complaint.  *See* Opp'n at 22 ("The Handbook is the 'law,'

7   and Wells Fargo's violations of it are *per se* violations of California's laws against unfair

8   competition.").  But their contention is predicated on the erroneous belief that "mortgage loan

9   servicers had to comply" with the Handbook and the regulations it superseded.  *Id.* (citing TAC Ex.

10  2, ECF No. 33-2 at 4).  But that same page explains that: "[t]his Handbook constitute Program

11  Documentation under the Servicer Participation Agreement and is incorporated by reference into the

12  Servicer Participation Agreement."  TAC Ex. 2, ECF No. 33-2 at 4.  They Graybills fail to explain

13  how they can use the UCL to enforce a guidelines for compliance with a government contract and

14  the court finds that they cannot.  Accordingly, their unlawful UCL claim is dismissed.

15       As to the unfair prong, the Graybills argue that it was unfair for Wells Fargo to not abide by the

16  HAMP guidelines and unfair to inform them that they could serially dispute the ineligibility

17  decision.  *See* Opp'n at 24.  Wells Fargo counters that the Graybills lack standing because they did

18  not suffer a financial injury.  Mot. at 24.  The court agrees with Wells Fargo.  Because the Graybills

19  were not entitled to a loan modification, Wells Fargo's alleged failure to follow the guidelines did

20  not injure them.  *Accord Nungaray v. Litton Loan Servicing, LP*, 200 Cal. App. 4th 1499, 1501 n.1

21  (2011), as modified (Dec. 1, 2011) (explaining that HAMP applicants are not entitled to

22  modification because many of the values used in the NPV calculation are within the servicer's

23  discretion).  Accordingly, they lack standing.  Nor do the Graybills plead facts to support an

24  inference that they could have avoided foreclosure absent the purported misrepresentation about

25  serially disputing ineligibility decision.

26       Finally, the Graybills contend that Wells Fargo was not competing fairly because it did not

27  follow "the rules that applied to all loan servicers that entered into loan servicers' agreements with

28  Fannie Mae to offer HAMP loan modifications" while other lenders did follow those rules.  TAC

¶ 183.  The Graybills lack standing to complain that Wells Fargo unfairly competed with other banks.  Accordingly, the court grants Wells Fargo's motion to dismiss the Graybills' claim under the unfair prong.

As to the fraud prong, Wells Fargo argues that the claim fails because it does not allege facts showing that members of the public are likely to be deceived by the alleged fraudulent business practice.  Mot. at 24.  In opposition, the Graybills explain that their claim is based on the same theories as their common-law fraud claim but do not address this argument.  *See* Opp'n at 25.  The court previously dismissed the Graybills' fraudulent UCL claim on this basis and does so again here. *See* Order, ECF No. 30 at 22-23 (citing *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255 (2009); *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1275 (2006)).  In sum, the court dismisses claim four in its entirely.

### E.  Negligence (Claim 5)

In the SAC, the Graybills stated a negligence claim based on allegations that Wells Fargo "assumed duties of care to the Plaintiffs that went beyond the usual lender and borrower relationship" when it "undertook to provide [them] with an opportunity for a HAMP modification," "informed the Plaintiffs of the HAMP application process and . . . how that process would and would not affect a foreclosure sale of the Plaintiffs' home . . . ."  *See* Order, ECF No. 30 at 24 (quoting SAC ¶¶ 182-83).  In the TAC, the Graybills' negligence claim is unchanged except for two new paragraphs of legal argument.  *See* TAC ¶¶ 196-97.  The court adopts it previous reasoning here and again dismisses because "the allegations do not establish a duty of care beyond Wells Faro's conventional role as a lender."  Order, ECF No. 30 at 24.  The court dismisses claim five.

### F.  Declaratory Relief (Claim 6)

The declaratory judgment claim in the TAC is identical to the claim in the SAC, and the court dismisses it again for the same reasons.  *Compare* SAC ¶¶ 199-205, *with* TAC ¶¶ 216-22; *see* Order, ECF No. 30 at 24.

### G.  Fraud and Breach of Fiduciary Duty (Claim 7)

The Graybills also allege fraud and breach of fiduciary duty surrounding the 2006 refinancing of their loan.  *See* TAC, ECF No. 33, ¶¶ 223-48.  This claim is based on the alleged statements that

UNITED STATES DISTRICT COURT
For the Northern District of California

1    loan officer Patricia Rufenacht made to them regarding the advisability of a refinance under the

2    PICK-A-PAYMENT plan.  *See id.* (alleging that she said that it was the best plan, that the interest

3    rate was tied to an index with historically low rates, that industry experts predicted interest rates

4    would fall, and that a worst-case-scenario rise in interest rates would have only a negligible effect on

5    their payments).  The factual allegations are unchanged from allegations in the SAC.[4]  *Compare*

6    SAC ¶¶ 206-24, 237, & 243-45, *with* TAC ¶¶ 223-48.  The only substantive difference is that the

7    Graybills now allege a breach of fiduciary duty claim.  Wells Fargo moves to dismiss, arguing that

8    the claim is barred by the statute of limitations, not pleaded with particularity, preempted by the

9    Home Owners Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461, *et seq.*, and for failure to sufficiently

10   allege a breach of fiduciary duty.  Mot., ECF No. 34 at 28-34.

11       **1. Fraud Claim**

12       The court previously dismissed the Graybills' fraud claim based on these allegations.  *See* Order,

13   ECF No. 30 at 25-26.  Because there is no new basis for this claim, the court dismisses it again for

14   the same reasons.

15       **2. HOLA Preemption**

16       Wells Fargo also argues that HOLA preempts the Graybills' claim, regardless of whether it is

17   labeled as fraud or breach of fiduciary duty.  Mot. at 29-31.  The court agrees.

18       "Congress enacted [HOLA] to charter savings associations under federal law, at a time when

19   record numbers of home loans were in default and a staggering number of state-chartered savings

20   associations were insolvent.  HOLA was designed to restore public confidence by creating a

21   nationwide system of federal savings and loan associations to be centrally regulated according to

22   nationwide 'best practices.'"  *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008)

23   (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 160-61 (1982)) (internal

24   citation omitted).

25       HOLA created the Office of Thrift Supervision ("OTS") to administer the statute, and "it

26

27       [4]  The TAC divides the SAC's single fraud and misrepresentation claim into two claims, one

28   for "fraud and breach of fiduciary duty in the sale of the loan," and one for "fraud in the alteration of
     Plaintiffs' loan application."

provided the OTS with 'plenary authority' to promulgate regulations involving the operation of

federal savings associations." *State Farm Bank v. Reardon,* 539 F.3d 336, 342 (6th Cir. 2008).

Under one of those regulations, 12 C.F.R. § 560.2, OTS makes clear that it "occupies the entire field

of lending regulation for federal savings associations," leaving no room for conflicting state laws.

The regulation goes on to provide a non-exhaustive list of examples of state laws which are

expressly preempted. *See* 12 C.F.R. § 560.2(b). The preempted state laws include those that impose

requirements relating to:

> (4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;
>
> (5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;
>
> . . .
>
> (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;
>
> (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

12 C.F.R. § 560.2(b). If the type of law in question is listed in 12 C.F.R. § 560.2(b), it is preempted.

*Silvas v. E Trade Mortgage Corp.*, 514 F.3d 1001, 1005 (9th Cir. 2008). "Even state laws of general

applicability, such as tort, contract, and real property laws, are preempted if their enforcement would

impact federal savings associations in areas listed in § 560.2(b)." *Stefan v. Wachovia*, No. C 09-

2252 SBA, 2009 WL 4730904, at *3 (N.D. Cal. Dec. 7, 2009) (holding all of plaintiffs' state law

claims regarding the foreclosure process, such as wrongful foreclosure, and plaintiffs claim that the

terms of the loan were unconscionable, were preempted by HOLA).

    As a threshold matter, Wells Fargo contends that HOLA applies here because World Savings

was a federal savings bank in 2007, when it made the 2006 Loan. Mot., ECF No. 34 at 29 n.4. The

Graybills do not dispute this, and the judicially noticed documents establish the same conclusion.

*See* Opp'n, ECF No. 38 at 29; *see also* RJN Exs. B-E, ECF No. 35-4 at 20-28. Accordingly, the

court finds that HOLA applies.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Next, Wells Fargo argues that HOLA preempts the claims in the TAC.  *See* Mot. at 30-13.  It

2    contends that the Graybills claim would impose requirements related to disclosure and advertising

3    and the processing and origination of mortgages.  *Id.*  It is undisputed that this claim is for

4    "misrepresentation in one form or another during the loan origination process."  *Garcia v. Wells*

5    *Fargo Bank*, No. 5:12-cv-01670 EJD, 2012 WL 2576206, at *3 (N.D. Cal. July 3, 2012) (claims

6    based on World Savings Banks' misrepresentations during mortgage origination preempted under

7    HOLA).  Accordingly, the court finds that it is preempted under HOLA.

8        The Graybills argue that HOLA does not preempt their claim because Rufenacht "went beyond

9    her role as a loan officer" in giving them advice, to that she was acting as "a financial advisor to the

10   Plaintiffs and assumed the role of a fiduciary."  Opp'n, ECF No. 38 at 29.  They do not, however,

11   explain why that would overcome the broad scope of HOLA preemption.  The Graybills cite *Wyatt*

12   *v. Union Mortgage Co.*, 24 Cal. 3d 773 (1979) in support of their claim.  But that case involved a

13   breach of fiduciary duty claim against a mortgage loan broker and several entities affiliated with the

14   Union Mortgage Company.  *Id.* at 779.  It does not mention HOLA preemption at all.

15       Indeed, ample authority shows that HOLA preempts breach of fiduciary duty claims in similar

16   circumstances.  For example, in *Appling v. Wachovia Mortg., FSB*, 745 F. Supp. 2d 961, 966 & 973

17   (N.D. Cal. 2010), the court found that HOLA preempted a breach of fiduciary claim based on the

18   failure to make disclosures and misrepresentations about the viability of refinancing under a World

19   Savings PICK-A-PAYMENT loan.  As in *Appling*, Rufenacht's alleged misrepresentations were

20   made in the processing, origination, and sale of a mortgage.  Accordingly, they are preempted by 12

21   C.F.R. § 560.2(b) and dismissed with prejudice.

22       **H.  Fraud in the Alteration of Plaintiffs' Loan Application (Claim 8)**

23       The Graybills also allege that Wells Fargo is liable for fraud based on Rufenacht's or another

24   Wells Fargo representative's allegedly altering their loan application so as to inflate their claimed

25   assets by $135,000 and add $5,00 to the value of their home.  TAC ¶¶ 249-71.  The court previously

26   dismissed this claim as barred by the statute of limitations for failure to allege detrimental reliance.

27   *See* Order, ECF No. 30 at 25-26.  Wells Fargo again moves to dismiss on the ground that the TAC

28   fails to allege detrimental reliance because Wells Fargo was defrauded, not the Graybills.  Mot. at

33.

This claim is substantially similar to the claim in the SAC, but there are several new allegations. *Compare* SAC ¶¶ 225-45, *with* TAC ¶¶ 249-71.  In the new allegations, the Graybills allege that when they attended the closing of their loan, they were presented with "voluminous documents some of which they reasonably believed they had already read."  TAC ¶ 257.  Based on that assumption, they allege that they "had no reason" to read the documents again.  *Id.* ¶ 258.  Nor did they have any reason to read or reread the documents later or to suspect their application had been altered.  *Id.* ¶ 259.  In July 2012, while packing their household goods, John Graybill came across the altered loan application.  *Id.* ¶ 260.  Until then, the Graybills were unaware that their loan application had been altered.  *Id.* ¶¶ 261, 264.  Finally, the Graybills claim that they were relied on "the approval of their loan application as evidence that they were qualified for it, and that they would be able to make the payments on the loan that they were taking out . . . ."  *Id.* ¶ 267.

As discussed in the previous order, the statute of limitations for fraud is three years, though the doctrine of equitable tolling may suspend the statute of limitations in some circumstances.  *See King v. State of California*, 784 F.2d 910, 915 (9th Cir. 1986).  "The inquiry is "whether there was excusable delay by the plaintiff:  If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs."  *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002) (internal quotation marks omitted).

The allegations copied from the SAC or the new allegations do not establish that the Graybills' delay in reading their loan documents was reasonable so as to toll the statute of limitations.  *See Kelley v. Countrywide Home Loans*, No. CVF-09-1148 LJO DLB, 2009 WL 3489422 at *4 (E.D. Cal. Oct. 26, 2009) (application of "discovery rule" rejected where plaintiff had all relevant information at the time of the loan transaction);  *Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp. 2d 1193, 1200 (N.D. Cal. 2010) ("A party alleging fraud has a duty to exercise diligence in discovering the fraud, such that the three year limitation begins to run when that party 'has the opportunity to obtain knowledge from sources open to his investigation.") (quoting *Lee v. Escrow Consultants, Inc.*, 210 Cal. App. 3d 915, 921 (1989)).  Nor do the Graybills provide a legal basis that

they were reasonable in assuming that they would be able to make payments on their loan just because the bank would give it to them.  Accordingly, the court grants Wells Fargo's motion to dismiss this claim.

## III.  LEAVE TO AMEND

The Graybills have had four opportunities to state valid claims for relief but have not succeeded. And many of the claims in the TAC are substantively indistinguishable from those in the SAC. When a party repeatedly fails to cure deficiencies, the court may order dismissal without leave to amend.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (affirming dismissal with prejudice where district court had instructed *pro se* plaintiff regarding deficiencies in prior order dismissing claim with leave to amend).  Under these circumstances, the court dismisses all of their claims with prejudice.

### CONCLUSION

The court **GRANTS** Wells Fargo's motion to dismiss all of the Graybills' claims with prejudice. The clerk of the court is directed to close the file.

This disposes of ECF No. 34.

**IT IS SO ORDERED.**

Dated: June 14, 2013

_____
LAUREL BEELER
United States Magistrate Judge